In the Supreme Court of Georgia

Decided: November 17, 2014

S14A0674. WALKER v. THE STATE.

BLACKWELL, Justice.

Cedrick Alexis Walker was tried by a Richmond County jury and convicted of the murder of Ramona Givens, the murder of Tyler Givens, and unlawfully concealing the death of Ramona. Walker appeals, contending that the evidence is insufficient to sustain his convictions, that the trial court erred when it excluded the testimony of a defense witness, and that he was denied the effective assistance of counsel. Upon our review of the record and briefs, we see no harmful error in the exclusion of the witness, and we conclude that Walker has failed to prove any denial of effective assistance. As to the sufficiency of the evidence, it is sufficient to sustain the conviction for the murder of Ramona, which we affirm. It is not, however, sufficient to sustain the conviction for concealing her death, which we reverse. The evidence also is not sufficient — because of the particular legal theory by which the State charged Walker — to

sustain his conviction for the murder of Tyler, which we reverse as well. Accordingly, the judgment of the trial court is affirmed in part and reversed in part.[1]

1. Viewed in the light most favorable to the verdict, the evidence shows that Ramona and her infant son, Tyler,[2] shared an apartment in Augusta with Ramona's mother, Mona Lisa Givens. On the evening of Saturday, October 4, 2003, Mona Lisa said goodbye to Ramona and left the apartment for an overnight visit to Atlanta. The following evening, Mona Lisa returned to the apartment, where she found Tyler lying in his crib, dead. Next, Mona Lisa

---

[1] Ramona and Tyler were killed late on the evening of October 4, 2003 or early the next morning. Walker was indicted on December 30, 2003 and charged with the malice murder of Ramona, the felony murder of Tyler, and concealing the death of Ramona. Walker's trial began on March 27, 2006, and the jury returned its verdict three days later, finding Walker guilty on all counts. On April 28, 2006, the trial court sentenced Walker to a term of imprisonment for life for the murder of Ramona, a consecutive term of imprisonment for life for the murder of Tyler, and a consecutive term of imprisonment for ten years for unlawfully concealing the death of Ramona. Walker timely filed a motion for new trial on May 3, 2006, and he amended it several times, amending it for the last time on February 14, 2011. The trial court denied his motion on December 5, 2012. Walker timely filed a notice of appeal nine days later. The case was docketed in this Court for the April 2014 term and orally argued on April 18, 2014.

[2] When they were killed, Ramona was sixteen years of age, and Tyler was six weeks old.

2

discovered Ramona on a sofa in the living room, also dead. Mona Lisa summoned police officers to the scene.

When the officers responded, one was approached by Walker, who was among several people gathered outside the apartment. Walker explained that he was Ramona's boyfriend, and he was "adamant about wanting to help and speak [with the officers]." Eventually, Walker was taken — along with Mona Lisa and her boyfriend — to a police station for interviews. In his interview, Walker claimed at first that he had not seen Ramona during the weekend, but they had spoken by telephone, he said, on Saturday night. In that telephone conversation, according to Walker, Ramona said that a man had been watching her through a window of the apartment.[3] Soon, Walker admitted, however, that he actually had visited the apartment on Saturday night. Eventually, Walker said that he was present when Ramona died, claiming that she suffered a seizure as they were having sex, became paralyzed, stopped breathing, and died as he tried to administer cardiopulmonary resuscitation. Walker explained that he never

---

[3] Walker had given the same account of that telephone conversation to several relatives of Ramona, who had gathered with him outside the apartment as the officers arrived.

before had seen someone die, that he panicked, and that he ran from the apartment without seeing Tyler.

But the physical evidence did not support the account given by Walker. In the first place, Ramona had been found fully clothed, and investigators found no sperm or seminal fluid on her body or clothing. An autopsy revealed no disease or trauma affecting her brain or spinal cord that might have been indicative of a seizure or paralysis. The medical examiner did find, however, a whitish foam in her nose and mouth, a finding consistent with the eventual determination that Ramona died as a result of asphyxiation. Moreover, the account given by Walker failed to explain the death of Tyler. Tyler's autopsy revealed compression marks on his face, and "a very specific facial lividity pattern" from blood that pooled around his nose and mouth, a result, the medical examiner concluded, of "the central part of [his] face [having been] pressed into something." The medical examiner determined that Tyler too had died as a result of asphyxiation. Equally significant, the medical examiner determined as well that Ramona and Tyler died around the same time.

At trial, the jury was presented with the statements that Walker had given to officers, as well as the testimony of the medical examiners and others about

4

the physical evidence. In addition, a jailhouse informant testified that Walker had confessed to killing both Ramona and Tyler and had shared his motive, as well as the way in which he killed Ramona and her child.[4] And the jury was shown a letter written by Walker — found among Ramona's things — in which he expressed concern about her well being, said that he did not want to hurt her, but added that he had no time for her "games" and was not interested in being only her "partner" or "friend."

Walker contends that the evidence is insufficient to sustain each of his convictions, and below, we will consider each in turn. But before we begin, we address the standard of review. Walker asks that this Court "review the entire record and come to the conclusion that there was not overwhelming evidence [of his guilt]." That, however, is not the proper standard. Evidence may be less than overwhelming, but still sufficient to sustain a conviction. See Zamora v. State,

---

[4] According to this jailhouse informant, Walker said that he was angry with Ramona because she previously had miscarried his unborn child, and she then "disrespected him" by conceiving Tyler with another man while Walker was imprisoned for a drug offense. The informant testified that Walker claimed to have gone to the apartment while Mona Lisa was out of town because she did not like him, that he and Ramona argued about "why she could carry another man's baby" but not his, that he simultaneously choked Ramona and covered her face (so as to "throw off the cause of death"), that he suffocated Tyler by putting his hand over the baby's face, and that he then left the apartment.

291 Ga. 512, 514 (2) (731 SE2d 658) (2012). When we consider the legal sufficiency of the evidence, we must "put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." White v. State, 293 Ga. 523, 523 (1) (753 SE2d 115) (2013) (citation omitted). Instead, we must view the evidence in the light most favorable to the verdict, id., and we inquire only whether any rational trier of fact might find beyond a reasonable doubt from that evidence that the defendant is guilty of the crimes of which he was convicted. See Jackson v. Virginia, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). With this standard in mind, we now turn to the sufficiency of the evidence in this case.

(a) As to the killing of Ramona, Walker was convicted of malice murder. To prove malice murder, the State was required to show beyond a reasonable doubt that Walker "unlawfully and with malice aforethought, either express or implied, cause[d] the death of [Ramona]." OCGA § 16-5-1 (a). The State carried that burden, we conclude. Although the medical examiner may have been unable to explain the precise mechanism by which Ramona was asphyxiated, the State nevertheless offered evidence sufficient to prove that Walker was the cause of

6

her asphyxiation and that he caused her death unlawfully and with malice. That is enough to sustain his conviction for the murder of Ramona.

(b) For reasons that will become apparent soon enough, we next consider whether the evidence was sufficient to prove beyond a reasonable doubt that Walker unlawfully concealed the death of Ramona. To prove unlawful concealment, the State had to show that Walker, "by concealing the death of [Ramona], hinder[ed] a discovery of whether or not [she] was unlawfully killed." OCGA § 16-10-31. That is, the State had to prove that Walker actually concealed the fact of her death, and it had to establish that his doing so delayed or otherwise hindered the discovery that her death was an unlawful one. See Nazario v. State, 293 Ga. 480, 491 (3) (d) (746 SE2d 109) (2013) ("As the statutory text indicates, the gravamen of the offense is conduct that hinders 'a discovery' that a person has been unlawfully killed by concealing that death."). As to concealing the fact of death, we have found sufficient proof of that element in previous cases in which the evidence showed, for instance, that the body of the deceased was removed from the scene of death to a remote location,[5]

---

[5] See, e.g., Edenfield v. State, 293 Ga. 370, 371-373 (1) (744 SE2d 738) (2013); White v. State, 287 Ga. 713, 716 (1) (c) (699 SE2d 291) (2010); Duncan v. State, 283 Ga. 584, 585 (2) (662 SE2d 122) (2008); Young v. State, 280 Ga. 65, 65-66 (1) (623 SE2d 491) (2005);

7

that the body was burned,[6] that the body was dismembered,[7] that persons with knowledge of the death were prevented from reporting it by threats or intimidation,[8] and that persons in search of the deceased were misdirected intentionally.[9]

In this case, the State says that the element of concealment is satisfied by proof that Walker moved the body of Ramona from the floor to the sofa on which she was found and that he turned off a night light in the apartment before leaving. About the movement of the body to the sofa, we do not doubt that even moving a body a short distance might in some circumstances amount to concealment of the body. But here, there was no proof that the movement to the sofa made the body more difficult to see from any vantage point, nor that the positioning of the body on the sofa made it more difficult for anyone to discern that Ramona was, in fact, dead. About the turning off of the night light, we again

---

Bragg v. State, 279 Ga. 156, 157 (1) (611 SE2d 17) (2005); Ware v. State, 279 Ga. 17, 17-18 (1) (608 SE2d 643) (2005); Mitchell v. State, 274 Ga. 768, 770 (1) (560 SE2d 8) (2002).

[6] See, e.g., Hendrix v. State, 284 Ga. 420, 421-422 (1) (667 SE2d 597) (2008).

[7] See, e.g., McKibbins v. State, 293 Ga. 843, 844-847 (1) (750 SE2d 314) (2013).

[8] See, e.g., Duncan v. State, 283 Ga. 584, 585 (2) (662 SE2d 122) (2008).

[9] See, e.g., White v. State, 287 Ga. 713, 716 (1) (c) (699 SE2d 291) (2010).

do not dispute that the creation of conditions in which a body is more difficult to see could amount to concealment. But in this case, there is no evidence that turning off the night light made the body more difficult to see, especially since the light was located in the kitchen, not the living room in which Ramona was found, and there is no indication in the record that the kitchen light somehow would have illuminated the sofa on which her body lay. There simply is no proof at all that moving Ramona to the sofa or turning off a night light in another room in any way concealed the death of Ramona.

The State also notes some evidence that the back door of the apartment locked as Walker left it.[10] To the extent that the evidence shows that he locked it intentionally,[11] that circumstance arguably could amount to concealment of the fact of death, insofar as it would make it more difficult to access the place in which the body could be found, at least through that particular door. But even

---

[10] The jury heard a statement given by Walker in which he described hearing the door "click" as he left the apartment. That the back door was locked, however, was disputed by Mona Lisa and emergency personnel who responded to the apartment. Nevertheless, as we noted earlier, we leave the resolution of conflicts in the evidence to the jury, and so we accept that the jury could have found that Walker locked the door as he left.

[11] The State argued earlier in this appeal that Walker admitted to police that he intentionally locked the door to prevent anyone from finding her, but the State later conceded in a supplemental brief that no such admission was presented to the jury at trial.

9

assuming that the State proved that Walker intentionally locked the back door, and assuming that such conduct satisfies the concealment element, there is no evidence that it hindered the discovery of the unlawful killing in any way whatsoever. Mona Lisa, who found Ramona, used her key to open the front door of the apartment, and there is no suggestion that a locked back door delayed her entry. And there is no evidence that anyone else came to door that weekend and tried to enter, but was deterred by the locked door.

Finally, the State points to the evidence that Walker killed Tyler, thereby preventing the baby from crying and attracting the attention of neighbors who, the State argues, could have found Ramona sooner. To begin, we doubt that the killing of Tyler was shown to amount to concealing the fact of the death of Ramona, insofar as there is no testimony that the cries of a baby within the apartment would have been audible in any place outside it. At oral argument, the prosecuting attorney said that the apartment had thin walls and that numerous persons lived in close proximity to the apartment, but we have found no evidence of such facts in the record. But more important, even if the killing of Tyler could satisfy the concealment element, the State still had to prove that his killing actually hindered the discovery that Ramona was killed unlawfully. Even

10

if the jury could have inferred that his cries would have been audible outside the apartment, there is no evidence that they would have been audible from a place in which others were or likely would have been present on the weekend in question, much less that any such person likely would have responded to the cries in a way that would have led anyone to sooner discover Ramona.

Even viewed in the light most favorable to the verdict, we find no evidence from which a rational jury could find beyond a reasonable doubt that Walker did anything to conceal the fact of the death of Ramona that in any way hindered the discovery of the unlawful nature of her killing. See OCGA § 16-10-31. Accordingly, the evidence is legally insufficient to sustain the conviction for unlawfully concealing the death of Ramona. That conviction must be set aside.

(c) Last, we turn to the murder of Tyler. No doubt, the evidence was sufficient to prove that the conduct of Walker caused Tyler's death. But the State elected to charge Walker with neither the malice murder of Tyler nor a felony murder predicated on a felonious assault upon the baby. Instead, the State specifically charged Walker with a felony murder of Tyler predicated on the murder of Ramona and the unlawful concealment of her death. To authorize a

11

conviction under this particular theory of prosecution, the State had to prove beyond a reasonable doubt that Walker caused the death of Tyler "in the commission of" these specific predicate felonies. See OCGA § 16-5-1 (c). And to carry that burden, the State had to show, among other things, that Walker's commission of the predicate felonies was a proximate cause of Tyler's death. See State v. Jackson, 287 Ga. 646, 660 (6) (697 SE2d 757) (2010). We already have held, of course, that the State failed to prove that Walker unlawfully concealed the death of Ramona, and for that reason, the malice murder of Ramona is the only possible predicate felony upon which the conviction for the felony murder might be sustained.

There is no proof, however, that the murder of Ramona proximately caused Tyler's death. This is not a case in which an infant died as a result of neglect, prolonged exposure, or some other dangerous circumstance from which the child could have been rescued, but for the killing of its only potential rescuer. To the contrary, the State relied at trial on testimony that Walker admitted causing Tyler to asphyxiate by placing his hand over the face of the child. The State also relied at trial on physical evidence that Tyler had not just been left lying in a dangerous position in which he might unintentionally be

12

asphyxiated, but rather that Tyler had been pressed against something intentionally, leading to his asphyxiation. Indeed, the medical examiner testified that she specifically ruled out "positional asphyxiation" — that Tyler asphyxiated simply as a result of the position in which he was left in his crib — as a cause of the death of the child. And the State appears to have gone to great lengths at trial to show — by photographs of the child, as well as the testimony of several witnesses — that Tyler was old enough to lift and turn his head, such that he would be able to breathe even if left on his stomach. Finally, the evidence showed that Tyler and Ramona died around the same time. The State's theory of felony murder premised on the malice murder of Ramona — that her killing prevented her from coming to the aid of Tyler — simply does not correspond to the State's own evidence at trial. The evidence is legally

insufficient to sustain the conviction for the felony murder of Tyler as charged in the indictment, and we must reverse that conviction as well.[12, 13]

2. Walker claims that the trial court erred when it excluded the testimony of a defense witness. On the third day of trial, the prosecuting attorney announced that Walker had provided him with the name of a potential witness, Lashonda Darrian, who was a family friend of Walker.[14] Darrian was made available to the State at the end of that day — after the State had rested and the jury had been excused — and Darrian indicated that her testimony would be that, although Walker was incarcerated when Tyler was born and for a week or

---

[12] That the State chose to charge Walker by way of a convoluted theory of felony murder that did not match its own evidence — rather than by a straightforward theory of malice murder or felony murder premised on aggravated assault, which would have been consistent with that evidence — is puzzling. Nevertheless, we cannot affirm a conviction based upon a legal theory of the crime with which the defendant was never charged. See Childs v. State, 257 Ga. 243, 253 (17) (357 SE2d 48) (1987).

[13] Because the convictions for concealing the death of Ramona and the felony murder of Tyler must be set aside, several other claims of error asserted by Walker on appeal are moot. We do not need to consider the claim that his trial counsel was ineffective because he did not file a general demurrer to challenge the sufficiency of the indictment as it related to unlawful concealment and felony murder and because he did not move for a directed verdict on those counts. Nor need we consider the claim that the unlawful concealment should have merged with the felony murder. See Bright v. State, 265 Ga. 265, 285 (19) (455 SE2d 37) (1995).

[14] "Generally speaking, the parties are obligated to give notice at least five days before trial commences of any witnesses who may appear at trial." Jones v. State, 292 Ga. 593, 597 (4) (740 SE2d 147) (2013).

14

two weeks after the birth, he invited Ramona and Tyler to his family's house "all the time" after he was released, that Mona Lisa would pick Ramona and Tyler up in the evenings and then Ramona and Walker "would be on the phone all night," and that, in the few weeks between Walker's release from prison and the killings of Ramona and Tyler, she had never seen Walker argue with Ramona or mistreat Tyler in any way. The State objected to Darrian's proffered testimony, arguing that it was "entirely irrelevant to any of the issue[s] on trial." The trial court agreed, and the testimony was excluded.

It is well established that the exclusion of evidence that "is objected to on the ground of relevancy lies within the sound discretion of the trial court, whose decision will not be disturbed on appeal absent a clear abuse of discretion." O'Neal v. State, 254 Ga. 1, 3 (3) (325 SE2d 759) (1985). According to Walker, Darrian's proffered testimony was relevant because it served to rebut the State's claim that Walker "hated" Ramona. Even assuming that this testimony was relevant, as Walker claims, we conclude that its exclusion was harmless. Darrian's description of Walker as an attentive boyfriend was entirely consistent with the testimony of Mona Lisa, who said that she would drive Ramona and Tyler to the home where Walker lived after he was released from prison, that

15

Walker "would always show up [at Mona Lisa and Ramona's apartment] when [Mona Lisa was] at work," and that — even when Ramona and Walker were not able to be together — they would spend considerable time talking to each other on the telephone. Although Mona Lisa testified that she did not approve of the relationship between Walker and her daughter, her disapproval was not because she observed Walker mistreat either Ramona or Tyler, but rather because of the disparity in their ages. Neither Mona Lisa nor any of the State's other witnesses testified that they ever observed Walker argue with Ramona, treat Ramona or Tyler poorly, or act other than as an attentive boyfriend. So, while the evidence presented by the State suggested that Walker harbored some animosity toward Ramona about her decision to conceive a child while he was in prison, the evidence did not suggest that Walker treated her poorly in public or that he discussed his animosity with anyone prior to her death. As such, the excluded testimony was essentially cumulative of the testimony provided by Mona Lisa, and the probative value of the excluded testimony — assuming that it had any probative value — was not substantial enough to render its exclusion harmful. See McWilliams v. State, 280 Ga. 724, 727 (4) (632 SE2d 127) (2006).

16

3. Last, we consider the claim that Walker was denied the effective assistance of counsel and that the trial court, therefore, ought to have granted Walker a new trial. To prevail on a claim of ineffective assistance, Walker must prove both that the performance of his lawyer was deficient and that he was prejudiced by this deficient performance. Strickland v. Washington, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove that the performance of his lawyer was deficient, Walker must prove that the lawyer performed his duties at trial in an objectively unreasonable way, considering all the circumstances, and in the light of prevailing professional norms. Id. at 687-688 (III) (A). See also Kimmelman v. Morrison, 477 U. S. 365, 381 (II) (C) (106 SCt 2574, 91 LE2d 305) (1986). And to prove that he was prejudiced by the performance of his lawyer, Walker must prove "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Strickland, 466 U. S. at 694 (III) (B). See also Williams v. Taylor, 529 U. S. 362, 391 (III) (120 SCt 1495, 146 LE2d 389) (2000). This burden is a heavy one. See Kimmelman, 477 U. S. at 382 (II) (C). We conclude that Walker has failed to carry his burden.

17

(a) Walker asserts that his trial lawyer was ineffective because the lawyer failed to file a timely motion to suppress three statements given by Walker to police. When the "failure to file a motion to suppress is the basis for a claim of ineffective assistance, the defendant must make a strong showing that the damaging evidence would have been suppressed had counsel made the motion." Williams v. State, 290 Ga. 533, 535 (2) (a) (722 SE2d 847) (2012) (citation and punctuation omitted). Walker has failed to make such a showing as to any of the statements that he now claims should have been the subject of a motion to suppress.

First, Walker contends that the initial statement that he provided to police should have been suppressed because it was a custodial statement given before he was informed of the rights provided to him by Miranda v. Arizona, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966). See also Vaughn v. State, 282 Ga. 99, 102 (4) (646 SE2d 212) (2007) (Miranda warnings required only when a person is interviewed by law enforcement while in custody, and assessment of whether a person was in custody "involves an examination of the circumstances surrounding the questioning to determine whether a reasonable person would have felt at liberty to terminate the interrogation and leave") (citations omitted).

18

Here, although Walker's trial lawyer did not file a pretrial motion to suppress, he objected to the admission of the initial statement at trial, and the trial court conducted a Jackson-Denno[15] hearing outside the presence of the jury to consider the admissibility of the statement. The evidence presented at this hearing showed that Walker approached officers outside Ramona's apartment and identified himself as her boyfriend, that he told them that he wanted to help with their investigation, that he "wanted to come down and give a statement," that he was so "adamant about talking" to officers that, once he was brought to the station, they had to ask him to be patient while they first spoke with Mona Lisa and her boyfriend, that Walker was not handcuffed or restrained in any way,[16] and that the police officer who interviewed Walker made it clear to Walker that he was not under arrest but was being interviewed only because he had expressed an interest in helping the police in their investigation. Given that this same evidence would have been presented had Walker's lawyer filed a

---

[15] See Jackson v. Denno, 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

[16] Although Walker testified at the hearing on his motion for new trial that he was restrained in the interview room, this testimony was contradicted by the testimony of the police officer at the Jackson-Denno hearing, which the trial court apparently found to be credible. And "[o]n appeal, we accept the trial court's findings on disputed facts and credibility of witnesses unless clearly erroneous . . .." Green v. State, 291 Ga. 287, 291 (4) (728 SE2d 668) (2012) (citations and punctuation omitted).

pretrial motion to suppress, and given that this evidence supported the trial court's finding that the initial statement was made before Walker was placed into custody, Walker's lawyer was not ineffective because he failed to file a motion to suppress the initial statement. See Wiggins v. State, 280 Ga. 627, 629 (2) (632 SE2d 80) (2006).

Walker also claims that his lawyer was ineffective because he did not move to suppress a second statement that Walker made to the police. At the beginning of the second statement, Walker admitted that he was present when Ramona died, the interview was interrupted for the reading of Miranda warnings, and the interview continued after Walker signed a waiver of his rights. According to Walker, the portion of the second statement that followed his waiver of rights was procured by way of the "two-step interrogation technique" that was rejected in Missouri v. Seibert, 542 U. S. 600 (124 SCt 2601, 159 LE2d 643) (2004). But in Seibert, officers procured an initial statement in violation of Miranda, then advised the defendant of his Miranda rights without informing him that his initial statement would have been inadmissible, and finally conducted further interrogation that led the defendant to repeat the same information that he had provided in the inadmissible initial

20

statement. Id. at 606 (I); see also State v. Folsom, 286 Ga. 105, 108-109 (2) (686 SE2d 239) (2009). Here, in contrast, the portion of the statement that Walker provided prior to the reading of Miranda was admissible and not in violation of Miranda, and the continuation of the interview after Walker waived his rights was no circumvention of Miranda.

Finally, Walker claims that his lawyer should have moved to suppress a third statement, which he provided some five or six hours after the second. According to Walker, this statement was inadmissible because — although the police investigator reminded Walker that the Miranda warnings he previously heard "still applied" — the investigator did not repeat the warnings. But we have already held that there is no duty to repeat Miranda warnings for a follow-up interview that is part of a continuing interrogation. Sosniak v. State, 287 Ga. 279, 285 (1) (B) (695 SE2d 604) (2010); Williams v. State, 244 Ga. 485, 488 (4) (b) (260 SE2d 879) (1979). As a result, any motion to suppress filed on this ground would have been meritless.

(b) Walker also claims that his trial lawyer's performance was deficient because he failed to impeach the jailhouse informant with evidence of his prior felony convictions and to request a jury charge on impeachment by felony

21

convictions. See former OCGA § 24-9-84.1 (a).[17] But the record shows that Walker's lawyer *did* elicit testimony in which the informant admitted that he had murdered a man in 1996, was found guilty at trial, had his conviction affirmed on appeal, and was still in prison for the offense.[18] In addition, the trial court charged the jury that a witness could be impeached by proof that he had "been convicted of a crime of moral turpitude."[19] No doubt, a charge on impeachment by a felony conviction also was in order. But the jury knew not only that the informant had been convicted of murder but also that Walker had a felony drug conviction. So, a charge on impeachment by a felony conviction would not have been terribly helpful to Walker. For the jury, the charge referring to crimes of

---

[17] Because this case was tried before January 1, 2013, our new Evidence Code was not applicable to Walker's trial. See Ga. L. 2011, pp. 99, 214, § 101. In any event, substantially all of former OCGA § 24-9-84.1 was carried forward into the new Evidence Code, and it now can be found at OCGA § 24-6-609 (a), which provides for the admission of evidence of a witness's prior felony conviction — subject to time limitations — for impeachment purposes.

[18] In his appeal, Walker refers to the "convictions" of the jailhouse informant. But Walker did not introduce certified copies of any convictions at the motion for new trial hearing, nor did he introduce evidence of any felonies that the informant had committed other than the 1996 murder that he discussed at trial.

[19] In Georgia, prior to the 2005 enactment of OCGA § 24-9-84.1, a witness could be impeached by proof that he had been convicted of a crime of moral turpitude. See, e.g. Witcher v. Pender, 260 Ga. 248 (392 SE2d 6) (1990).

moral turpitude might have seemed ambiguous, and in these circumstances that ambiguity could have been helpful to Walker. Because the trial court did not inform the jury that Walker's felony drug conviction was, indeed, a crime of moral turpitude, the jury could have concluded (erroneously) that the informant could be impeached by his murder conviction but that Walker could not be impeached by his felony drug conviction. Or the jury could have concluded that the informant's crime was "more immoral" than Walker's crime and thereby determined that the informant was less trustworthy than Walker. And given that Walker's own credibility was central to his defense, it would have been reasonable trial strategy not to request an additional charge on impeachment by felony convictions.

(c) Walker asserts that his trial lawyer was also ineffective because he failed to request a charge on involuntary manslaughter. But whether to request a charge on a lesser crime or to pursue an "all or nothing" defense generally is a matter of trial strategy. Brown v. State, 285 Ga. 324, 327-328 (4) (676 SE2d 221) (2009). Here, it was not objectively unreasonable for Walker's lawyer to continue to pursue a defense that was consistent with Walker's claim that Ramona had some sort of seizure while they were having sex, that Ramona died

23

due to no fault of his own, and that he subsequently fled the apartment in fear. Because it was reasonable to put on a defense that Walker did not kill Ramona — either intentionally or unintentionally — his trial lawyer's performance was not deficient based upon a failure to request a charge on involuntary manslaughter. Id. at 328 (4).

(d) Finally, Walker appears to claim that his trial lawyer was ineffective because he failed to seek a directed verdict of acquittal on the charge of malice murder. But because the evidence was sufficient to sustain Walker's conviction for malice murder, any motion for a directed verdict would have been meritless, and the failure to make such a motion does not constitute deficient performance. Jessie v. State, 294 Ga. at 377 (2) (b); Nelson v. State, 283 Ga. 119, 121 (2) (a) (657 SE2d 201) (2008).

Judgment affirmed in part and reversed in part. All the Justices concur.