311 Ga. 48
FINAL COPY

S21A0396.  SWINSON v. THE STATE.

McMILLIAN, Justice.

Dan Toni Swinson appeals his convictions on two counts of malice murder in connection with the shooting deaths of Heber Jettie Bennett, Jr., and Eliace Marie Smith.[1] On appeal, he asserts that the evidence was insufficient to support his convictions; that the trial court erred in denying his motion to suppress evidence obtained from a search warrant for his cell phone records, which was

[1] Bennett and Smith were killed on June 30, 2013, and in connection with their deaths, a Seminole County grand jury indicted Swinson on two counts of malice murder, two counts of felony murder predicated on aggravated assault, and two counts of aggravated assault. At a jury trial that took place from August 24 to September 2, 2015, Swinson was convicted on all counts. The trial court sentenced Swinson as a recidivist under OCGA § 17-10-7 (c) to two consecutive life sentences without parole on the malice murder convictions. The aggravated assault counts merged for sentencing, and the felony murder counts were vacated by operation of law. Swinson's trial counsel filed a motion for new trial on September 25, 2015, which was amended by new counsel on June 22, 2018. The trial court denied the amended motion for new trial on April 7, 2020, following an evidentiary hearing. Swinson filed a timely appeal, which was docketed to the term of court beginning in December 2020 and submitted for a decision on the briefs.

based, in part, on a warrantless request for cell site information under the Stored Communications Act, 18 USC § 2701 et seq. (the "SCA"); and that the trial court erred in denying his motion for a mistrial after a witness testified about his incarceration on an unrelated charge. Swinson also asserts ineffective assistance of counsel on a number of grounds. We affirm.

1. Swinson first argues that the State failed to present sufficient evidence to allow any rational trier of fact to find beyond a reasonable doubt the essential elements of malice murder.[2] He asserts that the evidence at trial, which was all circumstantial, did not exclude his defense that "Mexicans" murdered Bennett and Smith.

Where, as here, a conviction is based on circumstantial evidence, the evidence must "not only be consistent with the

---

[2] Although Swinson argues that the evidence was insufficient to support his convictions on all of the charges in this case, because the felony murder charges were vacated by operation of law and the aggravated assault counts were merged into the murder convictions for sentencing purposes, his claims about the sufficiency of the evidence to support those crimes are moot. See *Anderson v. State*, 299 Ga. 193, 196 (1) n.4 (787 SE2d 202) (2016).

hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. Whether an alternative hypothesis is reasonable or whether the circumstantial evidence excludes every reasonable hypothesis save that of guilt is left to the jury, and this Court "will not disturb that finding unless it is insupportable as a matter of law." *Johnson v. State*, 307 Ga. 44, 48 (2) (834 SE2d 83) (2019). Moreover, in reviewing the sufficiency of the evidence as a matter of constitutional due process, this Court views the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, see *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979), and any conflicts in the evidence are left to the province of the jury. See *Walker v. State*, 296 Ga. 161, 163 (1) (766 SE2d 28) (2014).

So viewed, the evidence at Swinson's trial showed the following. In 2013, Swinson stored a white Honda Civic containing $100,000 in money and drugs at a friend's house in Ware County,

outside of Waycross. After someone broke into the car and took the money and drugs, Swinson stated that he was going to kill or "torture" the people who stole from him. When the friend identified his relatives Bennett and Smith, along with a younger relative,[3] as the ones who broke into Swinson's car, Swinson asked the friend for Bennett and Smith's address, and the friend gave Swinson a slip of paper with the address written on it.

At the time, Bennett and Smith lived in Seminole County, and Gene and Alva Reeves lived next door to them. At about 2:00 p.m. on June 30, 2013, the Reeveses left their home to take their grandchildren swimming. When they returned at around 3:45 to 4:00 p.m., they saw a gold-colored SUV parked at Bennett and Smith's house with both of its front doors open. Gene saw two men on the deck of the house, one noticeably taller than the other. Alva only saw one of the men as he was walking into the house. Later, Alva saw the man she had seen earlier, whom she described at trial

---

[3] Bennett was the friend's uncle and Smith was the friend's step-sister. Bennett and Smith, who were unrelated, were involved in a romantic relationship. The third relative was the friend's step-nephew.

as being in his mid-twenties to mid-thirties and around six feet tall. She also testified that Swinson "definitely could be" the man she saw that day.

The Reeveses then left on a short errand, and when they returned home, the gold SUV was gone. Later that evening, the Reeveses noticed that the door to Bennett and Smith's house was open while their air conditioner was running, but when they knocked on the door and called out, no one answered. The next morning, the Reeveses observed that the door to Bennett and Smith's shed was open, which was unusual because Smith, who kept antiques inside the shed, always locked it at night. When the Reeveses went next door to check on Bennett and Smith, they found the pair dead inside their home and called police.

Law enforcement responded and found Bennett's and Smith's bodies, one of the burners on the stove on, the oven door open, and evidence of a fire in the laundry room. Law enforcement also found .380 cartridge casings, one .380 bullet, and two pillows with marks later identified as being consistent with contact gunshots, meaning

that the muzzle of the firearm had been pressed against the surface of the pillow. A GBI medical examiner testified that Smith died from gunshot wounds to the head and Bennett died from multiple gunshots. The medical examiner also located three .380 bullets during her autopsies of the victims' bodies.

Swinson's girlfriend testified that Swinson left their house early on the morning of June 30, 2013, and cell phone records and testimony introduced at trial showed that cell phones belonging to Swinson and his son, Jamahrey Swinson, moved from Waycross in Ware County to Donalsonville in Seminole County, and back, that day. The records showed Swinson leaving Ware County at around 9:00 a.m. and returning by 7:45 p.m. that night.

The State also presented evidence showing that Swinson called his friend that day to get Bennett and Smith's address again, and although the friend no longer had the address, the friend provided a description of their cars at Swinson's request. The same day, Swinson asked his girlfriend to text him Bennett and Smith's address, which she did. Swinson's girlfriend also testified that she

6

owned a gold Chevrolet Tahoe that Swinson had permission to drive.

Swinson was interviewed by law enforcement on July 2, 2013, and he arrived at the interview in his girlfriend's gold Chevrolet Tahoe. During that interview, Swinson stated that Bennett and Smith had stolen drugs and money out of his car, but the drugs and money belonged to Mexican drug dealers for whom he sold cocaine. Swinson admitted that he obtained a handwritten address for Bennett and Smith, but he said he gave it to his drug-dealing associates, one of whom entered the address into a cell phone and burned the paper with the address on it. However, a search of the house Swinson shared with his girlfriend turned up a sheet of paper with the victims' street in Seminole County written on it, as well as a .380 bullet of the same brand as casings found at the victims' home.[4]

Swinson also admitted getting the colors of the victims' cars from his friend but said he gave it to "the Mexicans." However,

---

[4] The girlfriend testified that the bullet did not belong to her and that it must have belonged to Swinson.

Swinson's cell phone data showed that after he called his friend on the day of the murders, he made no other outgoing calls from his cell phone until 7:58 p.m. Although Swinson claimed he was in Waycross the entire day watching his new baby, his girlfriend testified that she did not think Swinson watched their child that day because she went to her mother's house at about 10:00 a.m. after Swinson left and stayed there until Swinson returned home that evening. Additionally, the men that Swinson identified as the Mexican drug dealers with whom he dealt were determined by law enforcement to have either been incarcerated at the time of, or to have been deported prior to, the murders.

Based on this evidence, the jury was not required to believe Swinson's claim that Mexican drug dealers murdered Bennett and Smith and could have found, instead, that Swinson's defense was excluded by the evidence. We conclude, therefore, that the evidence presented at trial was sufficient as a matter of Georgia statutory law and constitutional due process to authorize a rational jury to find Swinson guilty beyond a reasonable doubt of the two counts of

malice murder. See *Jackson*, 443 U.S. at 319 (III) (B); OCGA § 24-14-6.[5]

2. Swinson asserts two arguments with regard to the cell-site data[6] the State obtained from AT&T without a warrant under the SCA. First, he argues that the trial court erred in denying his motion to suppress cell phone evidence gathered by the State pursuant to a search warrant served on AT&T, which was based, in part, on the earlier obtained cell-site data. Swinson also argues that his trial counsel provided ineffective assistance of counsel in failing "to properly file" a motion to suppress evidence obtained as a result of that warrantless request to AT&T under the SCA. We see no merit

---

[5] Swinson asserted three separate enumerations of error raising the general grounds under OCGA §§ 5-5-20 and 5-5-21, but he addressed these enumerations as one in his appellate brief and argued only sufficiency of the evidence.

[6] As this Court recently explained in *Lofton v. State*, 310 Ga. 770 (854 SE2d 690) (2021),

> [a] "cell site" typically consists of a set of either three or six directional radio antennas mounted on a tower, light post, flagpole, church steeple, or side of a building. . . . Each time a phone connects to a cell site, the connection generates a time-stamped digital record in the service provider's account records that includes the particular cell site and the specific antenna activated . . . ; such records are known as cell-site location information.

Id. at 775 (2) n.3.

9

to either argument.

The record demonstrates that Swinson's trial counsel filed a pretrial motion to suppress his cell phone records and other evidence obtained by the GBI as a result of a search warrant served on AT&T. That motion cited information obtained from an earlier warrantless request to AT&T by the GBI based on exigent circumstances pursuant to 18 USC § 2702 (c) (4). In response to that warrantless request, AT&T provided 16 pages of records which included, among other things, cell-site data reflecting that Swinson's cell phone used cell phone towers between Ware and Seminole Counties on the day of the murders.

The trial court held a hearing on the motion to suppress, and the sole witness was the GBI agent who made the exigent circumstances request on July 2, 2013. Swinson's counsel argued that the cell-site data, and any evidence subsequently obtained from it, should be suppressed because the State was required to obtain a search warrant before AT&T could furnish the data. The trial court denied the motion to suppress, however, finding that the telephone

10

records pertaining to his cell phone were owned by AT&T, and Swinson did not have a reasonable expectation of privacy in those records; thus, he lacked standing to challenge the release of the records to the GBI, citing this Court's opinion in *Registe v. State*, 292 Ga. 154, 156 (734 SE2d 19) (2012). The trial court further concluded that suppression of the evidence was not a remedy available under applicable federal and state law and that AT&T complied with the law in producing the cell phone records.

(a) Swinson argues that the trial court erred in denying his motion to suppress because the United States Supreme Court held in *Carpenter v. United States*, 585 U.S. ___. ___ (I) (A) (138 SCt 2206, 201 LE2d 507) (2018), that "accessing seven days of [historical cell-site data] constitutes a Fourth Amendment search," id. at ___ (III) & n.3,[7] and that a search warrant is generally required to obtain

---

[7] We note that the holding in *Carpenter* was expressly limited to these facts, and the Court did not reach the question of "whether there is a limited period for which the Government may obtain an individual's historical [cell-site data] free from Fourth Amendment scrutiny, and if so, how long that period might be." *Carpenter*, ___ U.S. at ___ (III) & n.3.

such information from a third-party telephone carrier. Because the cell-site data in this case was obtained without a search warrant, Swinson asserts that *Carpenter* requires us to reverse the trial court's denial of his motion to suppress.[8]

However, *Carpenter* was decided almost three years after the trial court issued its order denying Swinson's motion. At the time of the order,

> no appellate precedent binding in Georgia courts held that a request or demand by a governmental entity to a cell phone service provider that the provider produce its records related to a customer's account constituted a search under the Fourth Amendment. Under then existing constitutional doctrine, a person generally lacked a reasonable expectation of privacy in business records owned and maintained by a third-party business.

*Lofton v. State*, 310 Ga. 770, 776-77 (2) (854 SE2d 690) (2021). See also *Registe*, 292 Ga. at 156 (holding that because defendants had no reasonable expectation of privacy in cell phone records, defendants

---

[8] "In reviewing a ruling on a motion to suppress, we review the trial court's factual findings for clear error and its legal conclusions de novo[,] . . . constru[ing] the evidentiary record in the light most favorable to the trial court's factual findings and judgment." *White v. State*, 307 Ga. 601, 602 (2) (837 SE2d 838) (2020) (citation and punctuation omitted).

12

generally lacked standing to challenge the release of such records under the Fourth Amendment), overruled by *Carpenter*, ___ U.S. at ___ (III) (A). Moreover, the SCA authorizes a service provider such as AT&T to voluntarily provide certain records to a governmental entity "if the provider has a good-faith belief that an emergency poses a risk of death or serious physical injury that requires disclosure without delay." See *Lofton*, 310 Ga. at 778 (2). See also 18 USC § 2702 (c) (4).

The evidence at the suppression hearing showed that when requesting Swinson's records, the GBI agent represented to AT&T that the exigent circumstances supporting the request were a "[d]ouble homicide in Seminole County, GA" and that the "[s]uspect is currently armed and dangerous." The GBI made the request at 7:41 p.m. on July 2, 2013. As the trial court found, at that time, GBI agents were concerned for the life of the third person involved in stealing Swinson's money and drugs. The agents were aware that Swinson had threatened to kill or torture the people who stole from him; two of the three people identified to him as being involved in

13

the theft had been murdered two days earlier; the third person involved stated that he feared for his life and thought Swinson was going to kill him; and Swinson was not yet in custody.[9]

Under these circumstances, we conclude that law enforcement's request for Swinson's cell phone records and AT&T's release of this documentation were based on "a good faith belief that the . . . voluntary disclosure of the requested records was authorized under the SCA" and binding appellate precedent at the time. *Lofton*, 310 Ga. at 783 (2). See also *Registe*, 292 Ga. at 156-57. Thus, it was objectively reasonable for the GBI to rely on the SCA and then-existing appellate precedent to request the most recent four days of cell phone records for a double-homicide suspect on the day after the murder was discovered, while the suspect was still at large, and where a potential threat of harm to a third victim existed. See *Lofton*, 310 Ga. at 783 (2).

Although Swinson asserts that we should nevertheless extend the holding in *Carpenter* to exclude the evidence obtained as a result

_____

[9] Swinson was not arrested until around 10:00 that night.

14

of the warrantless request to AT&T, we recently rejected a similar argument in *Lofton*. As we explained in that case, even if we were to apply *Carpenter* here, reversal of the trial court's order is not required

> unless exclusion would serve the purpose of deterring future Fourth Amendment violations by law enforcement officers, which is the sole purpose of the exclusionary rule. For exclusion of evidence obtained in violation of the Fourth Amendment to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs. [And] when the police act with an objectively reasonable good-faith belief that their conduct is lawful, . . . then suppression fails to yield appreciable deterrence, and exclusion is clearly unwarranted.

*Lofton*, 310 Ga. at 781-82 (2) (citations and punctuation omitted). See also *Davis v. United States*, 564 U.S. 229, 236-38 (II) (131 SCt 2419, 180 LE2d 285) (2011). Here, we have concluded that the GBI was acting in good faith when, based on exigent circumstances, it requested that AT&T provide Swinson's cell phone records, which included the cell-site data. Therefore, we conclude, as in *Lofton*, that

> [b]ecause, at the time of [Swinson's] trial, a federal statute, 18 USC § 2702 (c) (4), and binding appellate precedent, *Registe*, 292 Ga. at 157, authorized the investigatory conduct at issue, reversing the trial court's

15

decision in this case would have little, if any, additional benefit in deterring future violations of the privacy interests recognized in *Carpenter*.

310 Ga. at 784 (2). Accordingly, we affirm the trial court's denial of Swinson's motion to suppress.

(b) We turn next to Swinson's assertion that his trial counsel provided ineffective assistance by failing to properly file the motion to suppress. To succeed on this claim, Swinson must demonstrate both that his trial counsel performed deficiently and that, in the absence of counsel's deficient performance, a reasonable probability exists that the outcome at trial would have been different. See *Strickland v. Washington*, 466 U.S. 668, 687-96 (III) (104 SCt 2052, 80 LE2d 674) (1984). To establish the first prong of the *Strickland* test, a defendant must show that trial counsel performed at trial "in an objectively unreasonable way, considering all of the circumstances and in light of prevailing professional norms." *Shaw v. State*, 307 Ga. 233, 249 (6) (835 SE2d 279) (2019) (citation and punctuation omitted). And the reasonable probability of a different outcome required to meet the prejudice prong "is a probability

16

sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694 (III) (B). If Swinson fails to satisfy either part of the *Strickland* test, we need not consider the other part. See *Hawkins v. State*, 306 Ga. 809, 812 (2) (833 SE2d 522) (2019).

Swinson asserts that if his trial counsel had "properly filed" and argued the motion to suppress the cell-site data provided by AT&T, then the trial court would have granted it. However, trial counsel essentially made the arguments later accepted in *Carpenter*, but which had been rejected in *Registe*, and Swinson does not identify any other arguments that his trial counsel should have made. Swinson, therefore, has not shown that his counsel performed deficiently, and his ineffective assistance of counsel claim on this ground fails. See *Esprit v. State*, 305 Ga. 429, 438 (2) (c) (826 SE2d 7) (2019) ("A criminal defense attorney does not perform deficiently when he fails to advance a legal theory that would require an extension of existing precedents and the adoption of an unproven theory of law." (citation and punctuation omitted)).

3. Swinson also contends that his trial counsel provided

ineffective assistance in failing to adequately cross-examine Alva Reeves about her testimony that Swinson "could definitely be" the man she saw on the day of the murders.

The record demonstrates that Swinson's trial counsel cross-examined Alva extensively at trial. In addition to asking questions regarding her eyesight, the weather conditions, and the distance from which she observed the man on the day of the murders, counsel also probed Alva regarding her failure to pick anyone out of a photographic line-up shown to her by law enforcement before trial. Moreover, during cross-examination, trial counsel obtained admissions from Alva aimed at undercutting her in-court identification, including that she knew that Swinson was the man on trial for the murders and that she had seen his photograph in the newspaper before trial. Trial counsel also pressed Alva on her inability to "know" that Swinson was the person whom she saw, and Alva conceded that Swinson only fit the description.

At the hearing on the motion for new trial, trial counsel testified that one reason he made the decision not to question Alva

18

further on her testimony that Swinson could be the man she saw was because he had received information before trial that she might change her testimony to be more certain of whom she saw that day. Because Alva did not testify that Swinson was definitely the man she saw, only that he could be, trial counsel decided to leave the jury with Alva's speculation, rather than to pursue further questioning that might cause her to make a more positive identification.

A strong presumption exists that a trial counsel's performance "fell within a wide range of reasonable professional conduct and that counsel's decisions were made in the exercise of reasonable professional judgment." *Marshall v. State*, 297 Ga. 445, 448 (2) (774 SE2d 675) (2015) (citations and punctuation omitted). To establish that his counsel's performance was deficient, Swinson must overcome this presumption by showing "that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not." *Davis v. State*, 299 Ga. 180, 183 (2) (787 SE2d 221) (2016). "In particular, decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if

19

they were so patently unreasonable that no competent attorney would have followed such a course." Id. (citation and punctuation omitted). "Decisions about what particular questions to ask on cross-examination are quintessential trial strategy and will rarely constitute ineffective assistance of counsel." *Davis v. State*, 306 Ga. 140, 146 (3) (e) (829 SE2d 321) (2019) (citation and punctuation omitted). Because we cannot say that trial counsel's strategy regarding Alva's testimony was so unreasonable that no competent attorney would have chosen the same strategy, we conclude that Swinson has failed to establish ineffective assistance of counsel on this ground.

4. In conjunction with his argument regarding trial counsel's cross-examination of Alva, Swinson asserts that newly discovered evidence from Jamahrey Swinson's plea hearing contradicted her in-court identification of Swinson. He argues that the trial court therefore erred in denying his motion for new trial because a substantial likelihood of a different verdict exists if the jury had

20

heard and considered Jamahrey's evidence.[10]

Jamahrey was indicted separately from Swinson in connection with the murders. After Swinson was convicted of the crimes, Jamahrey entered into a plea agreement in which he pleaded guilty to concealing the death of another and was sentenced to five years of probation. Jamahrey made an allocution in connection with that plea,[11] and Swinson called Jamahrey as a witness at the hearing on his motion for new trial. Jamahrey testified that during his plea allocution, he said that he was the man Alva saw on the day of the murders and that while he was interacting with her, he heard a gunshot. However, when questioned further, Jamahrey stated that he did not stand by the testimony he gave during his allocution; rather, he said his testimony at the plea hearing consisted of what his lawyer and the district attorney told him to say. Then, after the trial court advised Jamahrey that he could be subject to a felony

---

[10] Although Swinson raised this issue in his amended motion for new trial and presented evidence in support at the hearing, the trial court did not expressly address this ground in denying the motion for new trial.

[11] The record does not contain a transcript of Jamahrey's plea allocution.

charge of perjury if he changed the testimony he previously gave under oath, Jamahrey chose to assert his right against self-incrimination under the Fifth Amendment to the United States Constitution in response to any further questions about the circumstances surrounding the crimes.

For a new trial to be granted based on newly discovered evidence, the moving party must show:

> (1) that the evidence has come to his knowledge since the trial; (2) that it was not owing to the want of due diligence that he did not acquire it sooner; (3) that [the evidence] is so material that it would probably produce a different verdict; (4) that [the evidence] is not cumulative only; (5) that the affidavit of the witness himself [was] procured or its absence accounted for; and (6) that . . . the only effect of the evidence will [not] be to impeach the credit of a witness.

*Timberlake v. State*, 246 Ga. 488, 491 (1) (271 SE2d 792) (1980) (citations and punctuation omitted). Swinson has made no effort to show how Jamahrey's testimony fits within these requirements, and we conclude that it would not have been an abuse of discretion for the trial court to determine, at a minimum, that Swinson cannot establish the third *Timberlake* factor, requiring that the evidence be

22

so material that it would probably produce a different verdict.[12] Even if the jury accepted as true Jamahrey's testimony that he was the man Alva saw that day and that he heard a gunshot while in her presence, that evidence does not undermine the State's theory of the case. In fact, this testimony would be consistent with the cell phone evidence showing that Swinson and Jamahrey traveled together to Seminole County on the day of the murders and Gene Reeves's testimony that two men were present at the victims' home that day. Moreover, in light of this evidence, Jamahrey's testimony raises an inference that Swinson, not Jamahrey, shot the victims. Accordingly, we find no merit to Swinson's argument on this ground.

5.   Swinson next asserts that the trial court committed reversible error by failing to grant his motion for a mistrial regarding inadmissible testimony about his prior criminal history. Swinson also contends that his trial counsel provided ineffective assistance of counsel by failing to file a motion in limine to prohibit

_____

[12] See *Gittens v. State*, 307 Ga. 841, 850 (4) (838 SE2d 888) (2020) (reviewing denial of motion for new trial based on newly discovered evidence for an abuse of discretion).

23

mention of Swinson's prior criminal history.

After Swinson's friend testified about the circumstances involving the car Swinson kept on the friend's property, the State called the friend's wife as a witness to testify about her knowledge of Swinson's storage of the car. During the cross-examination of the friend's wife, Swinson's trial counsel asked what had prompted the witness on one occasion to ask Swinson if he was putting money and drugs in the car. She replied that she had observed that Swinson had tattoos that reminded her of the tattoos her son had gotten in prison, so she asked Swinson if he had been to prison or jail, to which Swinson replied that he had "a long time ago." Swinson's trial counsel then moved for a mistrial, noting that the answer was nonresponsive. The trial court ultimately denied the motion for a mistrial; instructed the friend's wife not to mention "anything about prison by anyone, particularly the defendant"; and instructed the jury to disregard the witness's answer to defense counsel's question as being nonresponsive and not to consider it in any way in rendering the verdict.

(a) "Whether to grant a motion for mistrial is within the trial court's sound discretion, and the trial court's exercise of that discretion will not be disturbed on appeal unless a mistrial is essential to preserve the defendant's right to a fair trial." *Hill v. State*, 310 Ga. 180, 189 (6) (850 SE2d 110) (2020) (citation and punctuation omitted). See also *Billings v. State*, 293 Ga. 99, 106 (7) (745 SE2d 583) (2013). Here, the testimony referring to Swinson's prior prison time came during cross-examination in an answer that was not directly responsive to trial counsel's question. Under such circumstances, the nonresponsive and fleeting reference to Swinson's prior time in prison does not improperly place his character in issue. See *Wade v. State*, 304 Ga. 5, 10 (3) (815 SE2d 875) (2018) (fleeting, nonresponsive reference to defendant's prior incarceration did not place his character at issue). Additionally, the trial court directed the jury to disregard the testimony and not to consider it in any way during their deliberations, and courts "ordinarily presume that a jury follows such [curative] instructions." *Coleman v. State*, 301 Ga. 720, 722 (3) (804 SE2d 24) (2017).

25

Under these circumstances, we cannot say that a mistrial was necessary to preserve Swinson's right to a fair trial, and thus we discern no abuse of discretion by the trial court in denying Swinson's motion on this ground. See *Thrift v. State*, 310 Ga. 499, 504 (3) (a) (852 SE2d 560) (2020) (no abuse of discretion in denying motion for mistrial based on nonresponsive answer to question); *Wade*, 304 Ga. at 10 (3) (same); *Graves v. State*, 298 Ga. 551, 555 (3) (783 SE2d 891) (2016) (same).

(b) Likewise, we conclude that Swinson has failed to show that he received ineffective assistance of counsel based on trial counsel's failure to file a motion in limine to exclude any references to his criminal history. At the hearing on the motion for new trial, trial counsel was asked whether he considered filing a motion in limine to prevent the State from eliciting any testimony about Swinson's prior criminal history. Counsel replied that he did not, but he indicated that filing a motion in limine might have given Swinson an additional ground upon which to base his motion for a mistrial in response to the friend's wife's testimony. He also agreed that

evidence of Swinson's prior prison time could potentially prove prejudicial.

However, as discussed above, the State did not elicit the testimony in question; rather, it came in the form of a nonresponsive answer to the defense's cross-examination. His trial counsel then immediately moved for a mistrial, which resulted in the trial court's instruction to the jury to disregard the witness's testimony. Therefore, Swinson cannot show that the filing of that motion would have prevented the witness's nonresponsive testimony or resulted in the grant of a mistrial under the circumstances. Because Swinson cannot show that his counsel performed deficiently by failing to file the motion in limine or that he was prejudiced within the meaning of *Strickland*, his claim of ineffective assistance of counsel on this ground fails. See *Lupoe v. State*, 300 Ga. 233, 244 (6) (794 SE2d 67) (2016) (no ineffective assistance of counsel based on failure to file a motion in limine where counsel objected at trial to the introduction of the challenged evidence).

6. Finally, Swinson argues that his trial counsel provided

ineffective assistance in failing to file a motion in limine to exclude the portion of Swinson's recorded statement to law enforcement in which he requested an attorney. Swinson notes that trial counsel and the prosecutor spent considerable time at trial discussing which portions of Swinson's statement should be redacted when it was played for the jury, but trial counsel did not ask that Swinson's request for counsel be excluded.

Although trial counsel conceded at the hearing on the motion for new trial that a good argument might be made for seeking to exclude that portion of Swinson's interview, he noted that in the portion of the statement containing the request, Swinson also told law enforcement that he cherished life and did not take other people's lives, which trial counsel believed could give the jury a different appreciation of who Swinson was. Moreover, trial counsel explained that in deciding which portions of the statement to exclude, he was concerned that if too much of the statement were redacted, which apparently was effectuated in court by stopping and fast forwarding the recording past the redacted portions, the jury

28

would think that the defense was hiding something incriminating. Therefore, trial counsel chose to leave the disputed portion of the statement in, thinking Swinson would perhaps benefit more than he would lose by doing so.

Based on this record, we conclude that trial counsel's decision not to redact Swinson's request for counsel was a matter of trial strategy, and Swinson has failed to show that trial counsel's strategy was so patently unreasonable that it constituted deficient performance under *Strickland*. See *McNair v. State*, 296 Ga. 181, 184 (2) (b) (766 SE2d 45) (2014) ("Trial tactics and strategy, no matter how mistaken in hindsight, are almost never adequate grounds for finding trial counsel ineffective. . . ." (citation and punctuation omitted)).

*Judgment affirmed. All the Justices concur.*

Decided March 1, 2021.

Murder. Seminole Superior Court. Before Judge Joe Bishop, Senior Judge.

*Harrell & Lewis, Jami L. Lewis*, for appellant.

*Thomas Earnest, District Attorney, R. Victor McNease, Jr., Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, William C. Enfinger, Assistant Attorney General*, for appellee.