311 Ga. 396
FINAL COPY

S21A0305.  OUTLAW v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Charles Outlaw was convicted of malice murder and other crimes in connection with the shooting death of Angela Rabotte. In this appeal, he contends that the trial court erred by denying his motions to suppress evidence derived from his cell phone records and statements that he made during a meeting in jail with his girlfriend. He also argues that his trial counsel provided ineffective assistance by failing to request a jury instruction on voluntary manslaughter. These claims are meritless, so we affirm.[1]

---

[1] Rabotte's dead body was found on April 3, 2014. In October 2014, a Gwinnett County grand jury indicted Appellant for malice murder, felony murder, aggravated assault, concealing the death of another, possession of a firearm during the commission of a felony, possession of a firearm by a convicted felon, and use of a firearm by a convicted felon during the commission of a felony. Appellant's first trial, which began on August 15, 2016, resulted in a mistrial during the presentation of the evidence. During his second trial, which was held from August 22 to 26, 2016, the trial court bifurcated the counts of possession and use of a firearm by a convicted felon, and the jury found Appellant guilty of the remaining counts. The court then nolle prossed

1. The evidence presented at Appellant's trial showed the following. Appellant and Rabotte had known each other as children and had reconnected in February 2014; they were friends and may have been romantically involved. In the early morning hours of March 29, 2014, Rabotte worked as a dancer at a bachelor party in Smyrna. When the party ended around 5:00 a.m., another dancer saw Rabotte carrying a money counter and overheard her on her cell phone arguing and asking for a ride home.

Later that day, Rabotte's friends became concerned when she did not arrive home. They reported to the police that she was missing and organized a search party in Norcross on March 31. Appellant was there, and a detective interviewed him that evening.

the bifurcated counts and sentenced Appellant as a recidivist to serve life in prison without the possibility of parole for malice murder and consecutive terms of ten years for concealing a death and five years for possession of a firearm during the commission of a felony; the court merged the remaining counts (although the felony murder count was actually vacated by operation of law, see *Malcolm v. State*, 263 Ga. 369, 374 (434 SE2d 479) (1993)). Appellant filed a timely motion for new trial, which he amended through new counsel in October 2018. After an evidentiary hearing, the trial court denied the motion in May 2020. Appellant filed a timely notice of appeal, and the case was docketed to the term of this Court beginning in December 2020 and submitted for a decision on the briefs.

Appellant said that he drove a Dodge Dart to pick up Rabotte after the party in Smyrna; on the way to Gwinnett County, they argued; he parked near his girlfriend Lakisha Fort's house in Norcross and walked to the house while Rabotte stayed in the car so Fort would not see her; and when he returned about 15 minutes later, Rabotte and the bags of clothes and the money counter she had been carrying were gone. On April 1, after a second interview, Appellant was arrested on charges (cocaine possession and violating the terms of his probation) unrelated to Rabotte's murder.

On April 3, Rabotte's dead body was found in a wooded area near Lilburn Industrial Way in Lilburn, where it appeared to have been carried and then covered with pine straw. The medical examiner who performed Rabotte's autopsy testified that Rabotte died from a contact gunshot wound to the left side of the back of her head. Investigators searched the Dodge that Appellant had been driving and found gunshot primer residue on the interior roof above the driver's area. Investigators also searched a house that Appellant often visited and found wrapped in a blanket in the attic a money

counter that was the same make, model, and color as the one Rabotte was seen carrying at the bachelor party.

About three weeks after the murder, on April 24, Appellant's girlfriend Fort visited him in jail. A detective had provided her with a small audio-recording device, which she hid in her clothing and used to record the meeting with Appellant; the audio recording of the meeting was played for the jury during the trial. The recording reflects that Appellant maintained that he did not kill Rabotte. Fort testified, however, that during several lengthy pauses (which are also reflected on the recording), Appellant whispered, mouthed words, and used body language to tell her that he and Rabotte argued in the car; Rabotte put a gun to his head; and he took the gun and shot her in the back of the head.

Fort also testified that her brother told her that Appellant had woken him on the morning Rabotte was last seen alive, saying "I think I killed the old girl." Appellant's jail cellmate testified that Appellant admitted shooting Rabotte in the head with a handgun as they argued, then putting her in the trunk, disposing of her body,

4

and having the car cleaned.

In addition, Rabotte's cell phone records showed that on the morning she was last seen, March 29, her phone was in Smyrna at 4:52 a.m., near Jimmy Carter Boulevard at 5:32 a.m., and heading toward Lilburn at 5:41 a.m. Rabotte's phone was not used again after that time. The records for Appellant's two cell phones, one of which received service from MetroPCS and the other from Verizon, showed that on March 29, both phones were near Jimmy Carter Boulevard around 5:24 a.m. The MetroPCS records placed that phone near Lilburn Industrial Way, where Rabotte's body was found, at 5:49 a.m.

2. Appellant contends first that the trial court erred by denying his motion to suppress evidence of cell-site location information (CSLI) that was obtained from his cell phone records. See *Lofton v. State*, 310 Ga. 770, 775 n.3 (854 SE2d 690) (2021) (explaining CSLI). We disagree.

(a) On April 10, 2014, seven days after Rabotte's body was found, the State filed motions that requested court orders requiring

Verizon and MetroPCS to disclose Appellant's cell phone records, including CSLI, from March 27 through April 5, 2014. The motions detailed the facts of the investigation into Rabotte's murder and said that the records would be "relevant and material to the investigation." The trial court then issued orders that required Verizon and MetroPCS to disclose the requested records under the federal Stored Communications Act (SCA). See 18 USC § 2703 (c) (1) (B) & (d).[2]

Before trial, Appellant filed a motion to suppress the CSLI

---

[2] 18 USC § 2703 (c) (1) authorizes a governmental entity to "require a provider of electronic communication service . . . to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications)," including, in subparagraph (c) (1) (B), when the governmental entity "obtains a court order for such disclosure under subsection (d) of this section." 18 USC § 2703 (d) then says, in pertinent part:

> A court order for disclosure under subsection (b) or (c) may be issued by any court that is a court of competent jurisdiction and shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that . . . the records or other information sought[ ] are relevant and material to an ongoing criminal investigation. In the case of a State governmental authority, such a court order shall not issue if prohibited by the law of such State.

OCGA § 16-11-66.1 (a) permits a prosecutor to require the disclosure of cell phone records "to the extent and under the procedures and conditions provided for by the laws of the United States."

evidence derived from the MetroPCS records; the trial court ultimately denied the motion summarily. During the trial, the court admitted into evidence and an investigator testified about the Verizon and MetroPCS records and two maps that the investigator had created. As mentioned above, one of the maps plotted both of Appellant's phones near Jimmy Carter Boulevard, which was the area where Rabotte's phone was also located, around 5:24 a.m. on March 29; the other map plotted Appellant's MetroPCS phone near Lilburn Industrial Way, where Rabotte's body was later found, at 5:49 a.m.

(b) Appellant argues that the State's failure to obtain a search warrant for his cell phone records violated his right against unreasonable searches and seizures under the Fourth Amendment to the United States Constitution. Appellant relies on the United States Supreme Court's 2018 decision in *Carpenter v. United States*, 585 U.S. ___, ___ (138 SCt 2206, 201 LE2d 507) (2018), which held that "accessing seven days of CSLI constitutes a Fourth Amendment search" for which the government generally must obtain a search

7

warrant based on probable cause, not merely a court order issued pursuant to 18 USC § 2703 (d). *Carpenter*, 138 SCt at 2217 n.3, 2221. Appellant argues that the trial court therefore should have suppressed the CSLI evidence derived from his cell phone records under the exclusionary rule for violations of the Fourth Amendment. See *Illinois v. Krull,* 480 U.S. 340, 347 (107 SCt 1160, 94 LE2d 364) (1987) ("When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure."). We can assume without deciding that Appellant preserved for ordinary appellate review his claim that the trial court should have suppressed the CSLI evidence obtained from his Verizon records, because the exclusionary rule did not preclude the admission of either that evidence or the CSLI evidence derived from his MetroPCS records.

As we recently explained in *Lofton*, two good-faith exceptions to the exclusionary rule apply to this situation. See 310 Ga. at 782. Lofton challenged the denial of his motion to suppress CSLI

8

evidence derived from a detective's request for the disclosure of Lofton's cell phone records under another provision of the SCA, 18 USC § 2702 (c) (4), on the ground that the detective's failure to obtain a search warrant for the records violated the Fourth Amendment under *Carpenter*. See *Lofton*, 310 Ga. at 775-778.[3] Noting that *Carpenter* was decided four years after Lofton's trial, we held that the good-faith exception to the exclusionary rule for searches conducted in objectively reasonable reliance on "'a statute that appeared legitimately to allow a warrantless . . . search'" applied, because at the time, 18 USC § 2702 (c) (4) authorized the detective to obtain the cell phone records without a search warrant. *Lofton*, 310 Ga. at 783 (quoting *Krull*, 480 U.S. at 360). We then determined that the exception for "searches conducted in objectively reasonable reliance on binding appellate precedent that is later overruled" also applied, because at the time of the investigative

---

[3] 18 USC § 2702 (c) (4) permits a cell phone service provider to disclose a customer's records to a governmental entity if the provider has a good faith belief "that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay."

conduct, appellate precedent binding in Georgia courts held that a search warrant was not required to obtain CSLI. See id. (citing *Davis v. United States*, 564 U.S. 229, 241 (131 SCt 2419, 180 LE2d 285) (2011)).[4]

Similarly, in this case, *Carpenter* was decided more than four years after the State requested and acquired Appellant's cell phone records in April 2014. At that time, 18 USC § 2703 (c) (1) (B) and (d) authorized the State to obtain a court order requiring the disclosure of the records if the State offered "specific and articulable facts" showing that there were "reasonable grounds to believe" that the records were "relevant and material to an ongoing criminal

---

[4] As we discussed in *Lofton*, in *United States v. Leon*, 468 U.S. 897 (104 SCt 3405, 82 LE2d 677) (1984), the United States Supreme Court recognized the first good-faith exception to the exclusionary rule, which applies to evidence obtained by an officer acting in good-faith reliance on a search warrant issued by a magistrate. See *Lofton*, 310 Ga. at 782 n.17. In *Gary v. State*, 262 Ga. 573 (422 SE2d 426) (1992), this Court construed OCGA § 17-5-30 to hold that there is no *Leon* good-faith exception to the exclusionary rule in Georgia. See *Lofton*, 310 Ga. at 782 n.17. As we had recently explained in *Mobley v. State*, 307 Ga. 59 (834 SE2d 785) (2019), however, *Gary*'s reasoning was unsound, and although in *Mobley* we deemed it unnecessary to decide whether to overrule *Gary*'s specific holding, we concluded that *Gary* does not foreclose the application of other exceptions to the exclusionary rule, including the *Krull* and *Davis* good-faith exceptions that apply here. See *Lofton*, 310 Ga. at 782-784 nn.17 & 18.

investigation." Appellant does not dispute that the State's motions requesting the court orders complied with those provisions of the SCA. And although *Lofton* involved a different SCA provision (18 USC § 2702 (c) (4)), the good-faith exception for objectively reasonable reliance on a statute that appeared legitimately to allow a warrantless search applies with equal force here, because 18 USC § 2703 (c) (1) (B) and (d) authorized the State's investigative conduct at the time. See *Smarr v. State*, 317 Ga. App. 584, 593-594 & n.24 (732 SE2d 110) (2012) (holding that trial counsel was not ineffective in failing to move to suppress the defendant's cell phone records, which the State obtained pursuant to a court order under 18 USC § 2703 (c) (1) (B) and (d), because a motion to suppress would not have been successful given the law at the time), overruled on other grounds by *Carpenter*, 138 SCt at 2221.

Also as in *Lofton*, when the State requested and obtained Appellant's cell phone records in April 2014, appellate precedent binding in Georgia courts held that defendants generally had no reasonable expectation of privacy in their cell phone records and

11

therefore lacked standing to raise a Fourth Amendment challenge to the disclosure of the records. See *Lofton*, 854 SE2d at 697, 702. See also *Ross v. State*, 296 Ga. 636, 639 (769 SE2d 43) (2015), overruled by *Carpenter*, 138 SCt at 2221; *Registe v. State*, 292 Ga. 154, 156 (734 SE2d 19) (2012), overruled by *Carpenter*, 138 SCt at 2221; *Smarr*, 317 Ga. App. at 593-594 & nn.24, 25. Because 18 USC § 2703 (c) (1) (B) and (d) and binding appellate precedent authorized the State's investigative conduct in April 2014, the exclusionary rule does not apply. Accordingly, the trial court properly denied Appellant's motion to suppress the CSLI evidence. See *Lofton*, 310 Ga. at 784. See also *Swinson v. State*, 311 Ga. 48, 55 (855 SE2d 629) (2021) (relying on *Lofton* to hold that the exclusionary rule did not apply to CSLI evidence that was obtained pursuant to 18 USC § 2702 (c) (4) and controlling appellate precedent in Georgia at the time); *Gialenios v. State*, 310 Ga. 869, 873-875 (855 SE2d 559) (2021) (same).[5]

---

[5] We note that our decisions in *Lofton*, *Swinson*, and *Gialenios* have not been consistent in identifying the point in time at which an officer's reasonable

3. Appellant contends next that the trial court erred by denying his motion to suppress evidence of the statements he made during his meeting in jail with his girlfriend Lakisha Fort. Asserting that Fort was acting as an agent of the State at the time of the meeting,

reliance on a statute or on binding appellate precedent should be determined. See *Lofton*, 310 Ga. 776, 784 (noting that the SCA and binding appellate precedent "[a]t the time of Lofton's trial" held that a search warrant was not required to obtain CSLI); id. at 779, 783 (concluding that the detective's reliance on the SCA and binding appellate precedent "at the time" of his "communications with MetroPCS" authorized the disclosure of Lofton's cell phone records); *Swinson*, 311 Ga. at 53 (noting that binding appellate precedent "[a]t the time of the [trial court] order" denying Swinson's motion to suppress held that a search warrant was not required to obtain CSLI); id. at 54 (determining that "law enforcement's request for Swinson's cell phone records and AT&T's release of this documentation were based on 'a good faith belief that (the) voluntary disclosure of the requested records was authorized under the SCA and binding appellate precedent at the time'" (quoting *Lofton*, 310 Ga. at 779-780)); id. (concluding that the SCA and binding appellate precedent "'at the time of [Swinson's] trial'" authorized the investigative conduct at issue (quoting *Lofton*, 310 Ga. at 784)); *Gialenios*, 310 Ga. at 876 (determining that "[a]t the time of the lieutenant's request for Gialenios' cell phone records," no binding Georgia appellate precedent held that a search warrant was required to obtain CSLI). But *Krull* and *Davis* make clear that the pertinent time is when the officer engaged in the investigative conduct at issue. See *Krull*, 480 U.S. at 356-357 & n.13 (holding that the exclusionary rule did not apply where a detective acted in good-faith reliance upon an apparently valid statute that was "in effect at the time of [the] search" of Krull's business); *Davis*, 564 U.S. at 235-236, 239-241 (explaining that "[a]t the time of the search" of Davis's car, a police officer acted in good-faith reliance on binding appellate precedent that was overruled while Davis's appeal was pending, two years after the search). To the extent that language in *Lofton*, *Swinson*, and *Gialenios* suggests that the law in effect at some other time is pertinent in determining whether a law enforcement officer's investigative conduct was authorized under the exceptions to the exclusionary rule set forth in *Krull* and *Davis*, that language is disapproved.

13

Appellant claims that he should have been given the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966), before he spoke with her and that the admission of his subsequent statements to her violated his right against compulsory self-incrimination under the Fifth Amendment to the United States Constitution. Assuming (without deciding) that Fort acted as a State agent when she met with Appellant, *Miranda* warnings were not required, and there was no Fifth Amendment violation, so this claim fails.

(a) During the hearing on the motion to suppress, the lead detective for Appellant's case testified as follows. On April 10, 2014, more than a week after Appellant was arrested on charges unrelated to Rabotte's murder, the detective interviewed Fort, who was incarcerated at the Gwinnett County Jail but participating in the work release program. Fort said that she was angry with Appellant, that she wanted to cooperate, and that Appellant had told her during phone calls from jail that he wanted to explain what happened but could not do so on the phone. She discussed meeting

14

with Appellant in person, and the detective contacted someone at the Gwinnett County Sheriff's Department to arrange the meeting. On April 24, the detective provided Fort with a small audio-recording device, which she hid in her clothing and used to record the approximately hour-and-fifteen-minute meeting with Appellant in a visitation room at the jail. Afterward, the detective took the recording device, listened to the recording, and interviewed Fort about the meeting. The detective testified that he did not promise Fort anything in exchange for her meeting with Appellant.

An investigator who worked at the jail testified during the hearing and at trial that it is an inmate's responsibility to arrange for a visitor; that the inmate must put the visitor's name on a visitation list; that at the time of the scheduled visit, the inmate usually walks to a visitation room and can come and go from the room; and that an inmate is not required to attend a scheduled visit. The trial court ultimately denied the motion to suppress summarily. Fort testified at trial that she had not been threatened or promised anything in exchange for her meeting with Appellant, but she

acknowledged on cross-examination that the detective had implicated her brother in Rabotte's murder, although she thought that the detective was "bluffing."

(b) Partly as a matter of safeguarding the Fifth Amendment right against compelled self-incrimination, *Miranda* warnings must be administered to a suspect who is subjected to "custodial interrogation." *Miranda*, 384 U.S. at 444.

> It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation. . . . Questioning by captors, who appear to control the suspect's fate, may create mutually reinforcing pressures that the [United States Supreme] Court has assumed will weaken the suspect's will, but where a suspect does not know that he is conversing with a government agent, these pressures do not exist.

*Illinois v. Perkins*, 496 U.S. 292, 297 (110 SCt 2394, 110 LE2d 243) (1990). Thus, "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*." *Perkins*, 496 U.S. at 296. See also id. at 300 (holding that "an undercover law enforcement officer posing as a fellow inmate need not give *Miranda* warnings to an incarcerated suspect before asking questions that may elicit an incriminating response").

16

In this case, Appellant had no reason to believe that Fort was acting as a State agent during their meeting (even assuming that she was). The audio-recording of the meeting gives no indication that Appellant felt intimidated or coerced by Fort, that he believed she had any legal authority to force him to answer questions, or that he thought she could affect his legal situation. See Perkins, 496 U.S. at 296-297 (explaining that "[c]oercion is determined from the perspective of the suspect" and "[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns"). See also *Gebhardt v. State*, 307 Ga. 587, 595 n.8 (837 SE2d 318) (2019) (relying on *Perkins* to reject the defendant's claim that he should have been given *Miranda* warnings before he made incriminating statements to his cellmate, who recorded the statements with a device that the police had provided him).

Moreover, even if Appellant had been aware that Fort was acting as a State agent (as we are assuming she was), he was not in custody for *Miranda* purposes at the time of their meeting.

17

"[I]mprisonment alone is not enough to create a custodial situation within the meaning of *Miranda*." *Howes v. Fields*, 565 U.S. 499, 511 (132 SCt 1181, 182 LE2d 17) (2012). Rather, in determining whether a person is in custody, "the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." Id. at 509 (citations and punctuation omitted).

The testimony at the pretrial hearing and at trial indicated that Appellant had requested that Fort visit him while he was in jail, and the investigator from the jail testified that inmates are responsible for arranging and attending visits and that they may come and go from the visitation room. The trial court was entitled to credit that testimony. Moreover, the audio-recording of the meeting shows that Appellant voluntarily spoke with Fort, and during their approximately hour-and-fifteen-minute visit, Appellant never indicated that he wanted to stop the meeting or that he believed that he was not free to leave the visitation room.

18

Given the totality of the circumstances, a reasonable person in Appellant's situation would have felt free to end the meeting with Fort and leave. See *Howes*, 565 U.S. at 510-517 (holding that the defendant, who was serving a sentence in jail, was not in custody for *Miranda* purposes when he was escorted to a conference room at the jail and interviewed by sheriff's deputies for five to seven hours about an allegation of criminal conduct that occurred before he was imprisoned, because he was told that he was free to return to his cell whenever he wanted, he was not physically restrained or threatened, he was offered food and water, and the door to the room was sometimes left open); *United States v. Higgins-Vogt*, 911 F3d 814, 820-821 (7th Cir. 2018) (concluding that the defendant, who had been arrested on robbery charges, was not in custody for *Miranda* purposes when he confessed committing a murder to a worker at the jail who held herself out as a counselor, because the defendant initiated the meeting with the counselor and was free to end his discussions with her at any time). Compare *Mays v. State*, 336 Ga. App. 398, 402-404 (785 SE2d 408) (2016) (holding that the

19

defendant was in custody under *Miranda* where a GBI agent questioned her in jail a week after she had been arrested for violating the terms of her probation, including by failing to complete community service, which was the main focus of the agent's questions; the defendant was scheduled to appear in court for a probation revocation hearing less than a week after the interview; the agent did not tell the defendant she was free to leave until about 15 minutes into the 23-minute interview; and it was not clear whether the defendant was restrained during the interview). For these reasons, the State was not required to administer *Miranda* warnings to Appellant before he met with Fort.

We also reject Appellant's claim that the admission of his statements to Fort violated his Fifth Amendment right against compelled self-incrimination. Based on the totality of the circumstances, the trial court did not err by concluding (implicitly) that his statements to Fort were voluntary and not the product of coercion. See *Perkins*, 496 U.S. at 298-300 (holding that "[t]he tactic [of placing an undercover agent in the defendant's cellblock]

20

employed [in that case] to elicit a voluntary confession from a suspect does not violate the Self-Incrimination Clause" and noting that "[t]he use of undercover agents is a recognized law enforcement technique, often employed in the prison context"); *Hoffa v. United States*, 385 U.S. 293, 295-299, 303-304 (87 SCt 408, 17 LE2d 374) (1966) (holding that the admission of testimony about the defendant's incriminating statements to a friend, who unbeknown to the defendant was acting as a government agent, did not violate the Fifth Amendment because the statements were not the product of any sort of coercion). See also *United States v. Washington*, 431 U.S. 181, 187 (97 SCt 1814, 52 LE2d 238) (1977) ("[F]ar from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable.").[6]

---

[6] The parties do not contend (and there is no evidence in the record indicating) that Appellant had invoked his Fifth Amendment right to counsel or right to silence before the meeting with Fort. See *Perkins*, 496 U.S. at 300 n.* (Brennan, J., concurring) (asserting that if the defendant had previously invoked those rights, the inquiry would focus on whether he then waived them before he spoke with the undercover agent).

We also note that cases involving alleged violations of the Sixth Amendment right to counsel where the government used an undercover agent to question a defendant, see, e.g., *Rai v. State*, 297 Ga. 472, 478-479 (775 SE2d

4. Finally, Appellant contends that his trial counsel provided ineffective assistance by failing to request a jury instruction on the lesser offense of voluntary manslaughter. See OCGA § 16-5-2 (a) (stating in pertinent part that voluntary manslaughter is the killing of another person under circumstances that would otherwise be murder when the killer "acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person"). To prevail on this claim, Appellant must show both that his counsel's performance was professionally deficient and that he suffered prejudice as a result.

129) (2015), do not apply to the analysis of Appellant's *Miranda* and Fifth Amendment claims (although both parties' briefs incorrectly rely on such cases). Appellant's Sixth Amendment right to counsel had not yet attached when he met with Fort, because at the time of the April 24 meeting, Appellant was in jail on charges of cocaine possession and violating the terms of his probation; he was not charged with crimes related to Rabotte's murder until nearly three months later, in July 2014. See *Perkins*, 496 U.S. at 299 (explaining that cases holding that the government may not use an undercover agent to circumvent the Sixth Amendment right to counsel did not apply because that right attaches only after charges have been filed and the defendant had not been charged with any crimes related to the murder when he made the statements to the undercover agent). See also *Texas v. Cobb*, 532 U.S. 162, 167 (121 SCt 1335, 149 LE2d 321) (2001) (explaining that the Sixth Amendment right to counsel is "offense specific" and "does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings" (citation and punctuation omitted)).

See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). We need not review both parts of this test if Appellant fails to prove one of them. See id. at 697.

Even assuming (dubiously) that the evidence presented at trial would have authorized a jury instruction on voluntary manslaughter, trial counsel's decision not to request the instruction was not so unreasonable that no competent attorney would have made it under the circumstances. "Decisions about which defenses to present and which jury charges to request are classic matters of trial strategy, and pursuit of an all-or-nothing defense is generally a permissible strategy." *Velasco v. State*, 306 Ga. 888, 893 (834 SE2d 21) (2019). At the hearing on Appellant's motion for new trial, his trial counsel testified that Appellant had consistently maintained that he did not know who killed Rabotte; that counsel and Appellant decided to assert that defense theory at trial; that counsel did not request a voluntary manslaughter instruction because choosing one defense theory provided "the best chance of winning this case"; and that if he had chosen to also present the contradictory theory that

Appellant killed Rabotte in the heat of passion, the prosecutor "would have jumped on it."

"It was not patently unreasonable for trial counsel, rather than risk losing credibility, to make the strategic decision not to seek a voluntary manslaughter charge" and to instead pursue only a defense that was consistent with Appellant's claim that someone else killed Rabotte. *Blackwell v. State*, 302 Ga. 820, 826 (809 SE2d 727) (2018). Thus, Appellant has not proved that his trial counsel performed deficiently in this regard, and his claim of ineffective assistance fails. See *Floyd v. State*, 307 Ga. 789, 801 (837 SE2d 790) (2020) (concluding that trial counsel did not perform deficiently by failing to request a voluntary manslaughter instruction, because a claim of voluntary manslaughter would have contradicted the defendant's defense that he was not involved in the victim's murder); *Velasco*, 306 Ga. at 893-894 (holding that trial counsel, who pursued an all-or-nothing justification defense, was not deficient for failing to request a voluntary manslaughter charge, because the defendant consistently maintained that he acted in self-defense).

*Judgment affirmed. All the Justices concur.*

Decided May 3, 2021.

Murder. Gwinnett Superior Court. Before Judge Fluker, pro hac vice.

*Maryann F. Blend*, for appellant.

*Daniel J. Porter, District Attorney, Lee F. Tittsworth, Samuel R. d´Entremont, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Eric C. Peters, Assistant Attorney General*, for appellee.