**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0425
Deandra Benson
v.
The State

On Appeal from the Superior Court of Cobb County
No. 23-9-1737

Decided: May 19, 2026

McMILLIAN, Justice.

Deandra Benson appeals from his convictions for malice murder and other crimes in connection with the shooting death of Timothy Bennett.[1] Benson asserts that (1) the trial court erred by proceeding to trial without issuing a written order on his motion for immunity from prosecution; (2) the trial court erred in denying the motion for immunity from prosecution; (3) the trial court

---

[1] The crimes were committed on February 10, 2023. In April 2023, a Cobb County grand jury indicted Benson for malice murder (Count 1), felony murder (Count 2), aggravated assault (Count 3), and possession of a firearm during the commission of a felony (Count 4). At a jury trial held in July 2024, Benson was found guilty of all counts. On August 7, 2024, the trial court sentenced Benson to serve life in prison for malice murder and a consecutive five-year term for possession of a firearm during the commission of a felony; the remaining counts either merged for sentencing purposes or were vacated by operation of law. Benson timely filed a motion for new trial, which was amended through new counsel in April 2025. Following a hearing, the trial court denied the motion, as amended, on August 14, 2025. Benson timely filed a notice of appeal, and his case was docketed to the term of this Court beginning in December 2025 and submitted for a decision on the briefs.

erred in denying Benson's motion to introduce evidence of prior bad acts committed by the victim under OCGA §§ 24-4-404 and 24-4-405; and (4) trial counsel rendered constitutionally ineffective assistance by failing to request a jury instruction on justification and the use of force in defense of personal property. We conclude that Benson waived appellate review of the trial court's failure to reduce to writing its oral ruling on the motion for immunity from prosecution, the trial court did not abuse its discretion in denying the motion for immunity from prosecution or in denying Benson's motion to introduce evidence of prior bad acts, and trial counsel was not deficient in forgoing a jury charge on defense of personal property, and so we affirm.

The evidence introduced at trial showed that Benson was in a romantic relationship with Timothy's sister, Leanna Bennett. Benson and Leanna lived together with their two young children in Cobb County. In the years leading up to the shooting, there were multiple instances of domestic disputes between Benson and Leanna. Leanna testified that Benson "got more controlling" over time, that he was verbally abusive, and that he "constantly" broke her cell phone and laptop. At times, their arguments became physical. In the fall of 2021, Benson choked her to the point that she could not breathe. Leanna briefly moved out after that incident and later discovered that Benson had placed a tracker in her belongings to identify her new location. The couple eventually reconciled, and Leanna moved back into their home in January 2022 after she became pregnant with their second child. However, their relationship then deteriorated, and Leanna decided to look for a new home for her and her children. In response, Benson put their home up for sale and told her, "[G]ood luck figuring out how to pay for a place."

Eventually, Leanna planned to move out of the house on

2

February 10, 2023, at a time when Benson would be attending a funeral with his father, Marcus Perryman. A couple of Leanna's male friends came to the house with a moving van and helped her pack while a nanny looked after the children. When Leanna told Timothy that she was planning to move out that day, Timothy immediately came to help. He drove his truck to the house, left it there, and then drove the loaded moving van to a storage unit that Leanna was renting. Leanna followed Timothy, and as she was leaving the neighborhood, she saw Benson returning from the funeral with his father.

When Leanna got back to the house, she saw Benson and Perryman taking bags of clothes out of the back of Timothy's truck. She went inside to sit with her children, and Benson came in with a knife in his hand. Leanna asked him why he had a knife, and he said, "I have this knife to cut a rope off your brother's truck."[2] Benson then ran upstairs, and when he came back down, he lifted his shirt and showed her a gun in his back pocket. He told her, "I will kill a N-word. … I know you had your brother and that gay boy in the house." Leanna immediately called her brother and her friend and told them that Benson had a gun and that they should not come back to the house.

As Leanna was still on the phone with her friend, she saw Timothy returning in the moving van. Benson ran out to the street, and Leanna followed, carrying their infant daughter. Benson immediately asked Timothy, "[M]y s**t in this truck[?]" Benson and Timothy continued to argue and call each other names in

---

[2] Leanna video recorded that interaction, and the video was played for the jury at trial.

3

the middle of the street before moving closer to the home. Perryman called 911 while Benson and Timothy were arguing.[3] Timothy told Leanna, "[G]et the kids and let's go." Leanna reminded Timothy that Benson had a gun in his back pocket and that he should leave.

According to Leanna, Benson shoved Timothy, and Timothy fell back into the bushes next to the house. When Timothy stood up, he shoved Benson back, and then they "locked arms." Perryman then came up from behind Leanna, while she was standing in the middle of the doorway of the house, and grabbed Timothy's arm. Leanna said, "[Perryman], no, stop" because Perryman had given Benson the opportunity to pull his gun out. Benson then aimed the gun at Timothy while he was on the steps in front of the doorway and "just emptie[d] it into him." Leanna ran upstairs to give the baby to the nanny before returning to Timothy to try to stop the bleeding; Benson did not attempt to render aid.

Perryman also testified at trial. According to Perryman, after he and Benson returned from the funeral that day, Benson went inside the house as he started to get into his car. Benson then came back outside and said, "I need you to help me to get my things out of this vehicle." Perryman agreed to help, and Benson went inside to get a knife to cut the straps tied down over the items in the back of the truck. Perryman heard Benson tell Leanna, "You can leave … But you can't take my things. You're not going to take things that belong in my home for my kids when they come visit me." Leanna responded, "I need it."

---

[3] A recording of Perryman's 911 call was played for the jury. Portions of the encounter were also captured on nearby Ring and Nest cameras and played for the jury at trial.

As they were standing on the steps outside, they saw a moving van coming down the street at a "very fast pace." After the van parked and Timothy exited the van, Benson walked over and asked Timothy, "Do you have any of my s**t in the truck?" Timothy slammed the van door and said, "I've been waiting a long time to f**k you up." At that point, Perryman, who knew that Benson had armed himself with a gun, called 911 and told Timothy, "You need to back up. I've already called the authorities."

While Perryman went into the house to look for something that had the address for the 911 dispatcher, he heard "all this commotion" as Benson and Timothy were "in [the] doorway." When he turned around, he saw that Timothy had Benson "in some type of headlock." Perryman "squeeze[d] through the threshold" and "grabbed at [Timothy] and … pull[ed] him away." After he pulled Timothy back, Benson "discharged the weapon," and Timothy fell "next to [a] planter" on the front steps leading to the house. After shooting Timothy, Benson "hit [Timothy] on the head with the gun." Perryman could not recall whether Timothy's hands were on Benson at the time that Benson fired the gun, but Perryman confirmed that Timothy never made physical contact with Perryman personally.

Law enforcement officers and emergency medical personnel arrived soon after Perryman called 911. Despite life saving measures, Timothy died of his wounds. Officers collected six .40-caliber shell casings outside the house near where Timothy was lying by a planter on the front porch, as well as a Smith & Wesson SD40 VE handgun in a drawer in the home's office. The gun's magazine was empty. Based on the location of the shell casings and the fact that there were no casings or projectiles or bullet holes inside, officers determined that the shooting had occurred outside the house. Officers observed that Benson had only "cat

scratches" on his face.

The medical examiner who performed Timothy's autopsy testified that Timothy had a total of nine gunshot wounds, including re-entry wounds, that would have caused Timothy to immediately collapse. Based on the location and trajectory of the gunshot wounds, the medical examiner opined that it was "very unlikely" that Timothy had been "wrestling or … charging the shooter head on, face to face at the time he was shot." And at least one of the gunshot wounds was inflicted while his arms were down by his side. Timothy did not have any injuries to his hands that would have indicated "rough punches or blows or anything like that done with the fists." The medical examiner concluded that the shooter and Timothy were at least a foot and a half apart when the shots were fired. Five of the gunshot wounds were determined to be independently lethal. Timothy also suffered blunt-force injuries to his head, including at least two broken teeth and hemorrhaging of the brain, that were consistent with being pistol-whipped. The medical examiner determined that Timothy died due to the gunshot wounds, with blunt-force head trauma as a contributing factor, and that the blunt-force head trauma could have been lethal on its own.

1. Benson first asserts that the trial court erred by proceeding to trial without issuing a written order on his motion for immunity from prosecution because without a written order, the oral denial of the motion for immunity from prosecution was a nullity and the failure to issue a written order before trial deprived Benson of the opportunity to seek a certificate of immediate review. As relief, Benson seeks a new trial preceded by another hearing on the motion for immunity from prosecution, so the trial court may issue a written order on the motion before trial.

Prior to trial, Benson filed a motion for immunity from prosecution pursuant to OCGA §§ 16-3-21 (defense of self), 16-3-23 (defense of habitation), and 16-3-24 (defense of personal property). Before the hearing on his motion, Benson filed an amended motion to add that he should be immune from prosecution pursuant to OCGA § 16-3-21 (defense of others). After the conclusion of Benson's evidence at the hearing, the State moved to dismiss the motion. The trial court granted the State's motion and orally declared its findings. The trial court noted testimony that Benson "was mad because [Leanna] … was leaving without telling him, that … [Benson's] aunt, who is usually the babysitter of the children, was in on this plan and that he was upset because she did not tell him that [Leanna was leaving.]" The trial court also noted that at least one of the shots was fired "while the victim is on the ground" and that Benson then "[took] the gun and hit[] the victim in the head while he's on the ground, after he had been shot." The trial court specifically found that Benson's testimony was not "completely credible" and that the evidence was "consistent with someone who is angry and decid[ed] they want to shoot the person, not in defense of themselves or their home or their relative." The trial court acknowledged that it was required to determine the issues "by a preponderance of the evidence" and concluded:

> I find the defense has not made a prima facie case of self-defense in all three areas. I base this upon the documentary evidence, the physical evidence, the photos. And I also base it upon my review of the evidence, my looking at the witnesses, my determining the credibility of the witnesses.

No written order was entered prior to trial commencing on

7

July 9, 2024.[4] Benson did not request a written order and announced ready when the case was called for trial.[5] When Benson raised the issue approximately one year after trial, the trial court prepared a written order denying Benson's pretrial motion for immunity, dating the order nunc pro tunc to July 1, 2024.[6]

Pretermitting whether the trial court was required to reduce its oral ruling to writing before trial, Benson failed to preserve this issue for appellate review. Benson never requested a written order before trial and instead announced ready for trial and proceeded with trial. In addition, to the extent that Benson is claiming that his due process right to seek a certificate of immediate review was violated by the trial court's failure to issue a written order before trial, Benson never requested a certificate of immediate review from the oral ruling or a written order. Thus, Benson has waived any appellate review of this enumeration of error. See, e.g., *Benton v. State*, 300 Ga. 202, 205 (2016) ("Generally, to preserve appellate review of a claimed error, there must be a contemporaneous objection made on the record at the earliest possible time. Otherwise, the issue is deemed waived on appeal." (punctuation omitted)).

---

[4] It appears that the trial court asked the State to prepare an order denying the motion, but no such order was filed. The State represents that a proposed order was emailed to the trial court's staff attorney and Benson's counsel on July 3, 2024, but it was not signed or filed.

[5] Benson does not argue that trial counsel was ineffective for failing to request a written order or a certificate of immediate review from the oral denial of the immunity motion.

[6] In that order, the trial court inadvertently included facts from an unrelated case; on July 14, 2025, the court entered an amended order nunc pro tunc denying the motion. Benson argues that he is harmed by the failure to issue a written order before trial because the nunc pro tunc order is invalid and includes more and different findings than the trial court's oral ruling. This argument will be addressed in Division 2.

2. Benson next asserts that the trial court erred in denying his motion for immunity from prosecution. We are not persuaded.

To prevail on a motion for immunity from prosecution, a criminal defendant must establish his justification defense by a preponderance of the evidence. See *Ellison v. State*, 313 Ga. 107, 110 (2022). In reviewing the grant or denial of such a motion, we review the evidence in the light most favorable to the trial court's ruling and accept the trial court's findings of fact and credibility determinations if there is any evidence to support them. See *Whisnant v. State*, 322 Ga. 253, 260 (2025). Here, the trial court heard testimony from Benson and Perryman, reviewed photographic and video evidence from the crime scene, listened to the 911 calls, watched Ring and Nest video recordings, and watched a portion of Perryman's interview with investigators.[7]

Benson testified at the hearing that he did not really know Timothy before the shooting but had "run across [him] a couple times." He explained, however, that Leanna "harbored this … obsession with using [Timothy] as a weapon" and that she "would threaten [him] … that she would have her brother come over to the house and f**k [him] up." Benson also testified that Leanna had told him that Timothy "wasn't allowed over at the [mother's] house because he went over there and threatened [their step-father] and the cops were called."

Benson stated that when he left the house the morning of the funeral, the house "was spotless" because it was "up for sale." When he returned, there were multiple televisions and boxes in the entryway, and several of his personal items were missing

---

[7] The evidence presented at the immunity motion hearing was largely the same as what was eventually presented at trial and described above, except that Benson did not testify at trial.

9

throughout the house. He noticed that there was a pickup truck parked in the street with his belongings in the back, so he asked his father to help him bring his things inside his home. Benson admitted that he was "mad" and "upset" because Leanna was "taking [his] things … to teach [him] a lesson that she was leaving because she has to leave [his] home."

As Benson and his father were bringing his stuff back in the house, Timothy came up, driving the U-Haul "kind of aggressively fast in the neighborhood." Benson was "upset with indignation, just because [he] kn[e]w that they're taking [his] things." Benson, who was armed at that time, approached the U-Haul and asked Timothy, "Hey, is my s**t in that van?" Timothy "ripped off" his shirt and "just slam[med]" things to the ground. Benson described Timothy as "out of control, zero to one hundred." The first thing Timothy said was, "I've been waiting a long time to do this." According to Benson, Timothy then "charge[d] towards [him], … grab[bed] [him], … head-butt[ed] [him]" and "started insulting [him]." Then, "[o]ut of fear of just being punched, [he] was holding his hands down to stop him from hitting [him]."

When Timothy pushed him backwards, Benson "immediately screamed at him in anguish: Don't put your f**king hands on me" and "started backing up towards [his] home." Once he made it back on his property, he "immediately ordered [Timothy] off of [his] property," but Timothy "wouldn't leave." Leanna ran out of the house carrying their infant daughter and "immediately start[ed] pleading with [Timothy] to stop and leave" and told Timothy that Benson had a gun. Benson told Leanna to bring their daughter back into the house, and Leanna complied.

Benson turned to follow Leanna into the house when Timothy "start[ed] coming right at [Benson]" and "bum-rushed [him]." At that point, both Benson and Timothy "stumbled on [a] bush,"

and they "f[e]ll back into the house." Benson claimed that he could smell alcohol on Timothy's breath. They continued to physically "struggle," and once Benson "got free," he saw Timothy and Perryman "in a physical struggle." Benson explained, "When he was attacking me, I did not defend myself. I took every bit of his dramatized brutality. But when it came to my father, that's when it sparked me to discharge my firearm." Benson claimed that when he fired the gun, he was "maybe five feet into [his] home" and that Timothy was "right at the threshold."

Benson admitted that after he shot Timothy, he "hit him in the head with the gun" after it looked like Timothy "lean[ed] up, like he[] [was] trying to get up." He agreed that he never told the police that he had pistol-whipped Timothy. Benson also admitted the following:

When I hit him, it was just a passionate, angry, heated moment. I just felt like everything came to me at once, all the stuff that he did to me. I just couldn't control myself, and I just hit him. When I seen him get up, I just hit him. It was just an emotional moment.

…

I felt like he kind of provoked me and agitated the situation to make me do something I didn't want to do. I felt like he had every opportunity to stop. I felt like I tried to make him stop. And I feel like he put me a position that's ruining his life and ruining my life, and I feel like it was all because of ego.

…

I will admit, when that happened – I'm not going to sit here and sugarcoat this -- that was a heated, emotional, passionate moment. I couldn't help myself, and I bopped him. I'm not going to justify that part, I will be honest with you.

11

As an initial matter, we note that Benson focuses his argument on the trial court's oral ruling because, as set forth in his first enumeration of error, he believes that the written order denying his motion for immunity motion was a legal nullity.[8] However, it is well settled that a trial court's written order governs over its oral pronouncement. See *State v. Hamilton*, 306 Ga. 678, 685 (2019) ("[E]ven if there were a discrepancy between an oral pronouncement and a written ruling, it is well settled that the discrepancy will be resolved in favor of the written judgment." (punctuation omitted)). Thus, we focus our analysis on the trial court's written order.

In its written order, the trial court concluded that Benson did not carry his burden to prove "by a preponderance of the evidence that he reasonably believed shooting the unarmed victim at least six times was necessary to prevent death or great bodily injury to himself or to his father." In reaching this conclusion, the

---

[8] Benson argues that the nunc pro tunc written order is a legal nullity because the trial court "used its nunc pro tunc power to entirely re-write the record with a new order on immunity containing substantive conclusions on the facts and law which were not reached until *a year after* the trial concluded." However, it is clear from the record that the trial court orally ruled on the motion for immunity from prosecution with factual findings, such that it was appropriate for the trial court to issue the written order denying immunity from prosecution nunc pro tunc. See, e.g., *Sigal v. Sigal*, 289 Ga. 814, 816–17 (2011) ("A nunc pro tunc order may properly be used to cause a written judgment … to relate back to the date of the original hearing and oral ruling."). And to the extent that Benson argues that the trial court's written order deviates from its earlier oral ruling, we are not persuaded that any differences are material to our analysis. In both rulings, the trial court reached the same conclusions: Timothy and Benson were involved in a verbal and physical confrontation; Benson shot Timothy multiple times, including at least one time while Timothy was on the ground; Benson pistol-whipped Timothy after shooting him; and Benson acted out of anger, not in defense of himself, his father, or his habitation.

12

trial court noted that Timothy "was not physically struggling against [Perryman] at the time of the gunfire"; that "[a]t least one shot was fired while [Timothy] was defenseless and on the ground"; that Benson "then pistol whipped [Timothy], even though [Timothy] was on the ground suffering from numerous gunshot wounds"; and that the evidence did "not establish that [Benson] acted out of fear."

As to defense of habitation, the trial court concluded that it "disbelieves [Benson's] testimony regarding his need to defend his home from [Timothy]" and that "the shooting was motivated by [Benson's] anger and not in defense of self, defense of others, or defense of habitation." Specifically, the trial court found that "[Perryman's] testimony and demeanor while doing so, the physical evidence on scene depicted by the crime scene photos, the position of the victim's body, and [Benson's] initial Mirandized police interview all collectively discredit [Benson's] testimony regarding [Timothy's] alleged entry into the residence."[9]

Under Georgia law, with respect to defense of self or others,

[a] person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force; however, except as provided in § 16-3-23, a

---

[9] The trial court also noted that Benson knew that Leanna was moving out and suspected that she was doing so with Timothy's help. The trial court further found that Benson may have engaged with Timothy with the intent to provoke him to violence—as evidenced by Benson's approaching Timothy at the U-Haul and "aggressively demand[ing] to know whether his 'sh*t' was in the van"—and then use the physical altercation as an excuse to inflict bodily harm on Timothy.

13

person is justified in using force which is intended or likely to cause death or great bodily harm only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony.

OCGA § 16-3-21(a).

In addition, with respect to the defense of habitation, as relevant here,[10]

[a] person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to prevent or terminate such other's unlawful entry into or attack upon a habitation; however, such person is justified in the use of force which is intended or likely to cause death or great bodily harm only if:

(1) The entry is made or attempted in a violent and tumultuous manner and he or she reasonably believes that the entry is attempted or made for the purpose of assaulting or offering personal violence to any person dwelling or being therein and that such force is necessary to prevent the assault or offer of

---

[10] Although Benson's motion for immunity from prosecution also included a reference to OCGA § 16-3-23(3) ("The person using such force reasonably believes that the entry is made or attempted for the purpose of committing a felony therein and that such force is necessary to prevent the commission of the felony."), it appears from the hearing transcript that Benson ultimately relied only on subsection (1). And in his brief on appeal, his argument is limited to subsection (1); thus, we limit our analysis to that subsection.

14

personal violence.

OCGA § 16-3-23.

We have recognized that the justification defense of self or others contains both subjective and objective components. Thus, "[i]n addition to showing that the defendant *actually* believed that his use of force was necessary," he also "must show that his fear was *objectively* reasonable." *Allen v. State*, 317 Ga. 1, 5 (2023) (emphasis added). Similarly, with respect to defense of habitation under the circumstances of this case, Benson "must have reasonably believed that the use of deadly force was necessary." *Clark v. State*, 307 Ga. 537, 541 (2019). Based on the evidence introduced at the hearing, the trial court did not abuse its discretion in finding that critical portions of Benson's testimony were not credible, that he acted out of anger rather than actual fear, and that he had not shown by a preponderance of the evidence that he was justified in shooting Timothy.[11] See *Whisnant*, 322 Ga. at 261 (affirming trial court's denial of motion for immunity from prosecution where the trial court found that the evidence supported the conclusion that the defendant killed the victim in anger or retaliation). Accordingly, this enumeration fails.[12] See *Ellison v. State*,

---

[11] To the extent that Benson challenges the trial court's factual findings that Perryman "never testified that the victim came into the house or was going to the house," we uphold a trial court's ruling if there is *any* evidence to support the trial court's factual findings, even if disputed or contradicted by other evidence. See *Allen*, 317 Ga. at 6 (as the finder of fact, the trial court "is not required to credit testimony merely because it is unrebutted"). There was evidence from Perryman that Timothy was shot on the "foyer" outside the home.

[12] Benson argues that the trial court neglected to rule on his claim of defense of personal property in connection with the immunity motion, see OCGA § 16-3-24. Pretermitting whether that claim was waived when counsel

15

313 Ga. 107, 111 (2022) (affirming denial of motion for immunity from prosecution where evidence "supported an inference that [appellant] shot [victim] out of anger, to assert dominance, or to avenge past wrongs, rather than in self-defense"); *Clark*, 307 Ga. at 541 (where evidence showed that defendant and victim were in a physical "'tug-of-war'" without any serious threat of harm, finder of fact authorized to conclude that defendant did not reasonably believe that deadly force was necessary to end the encounter under the circumstances).

3. Benson also asserts that the trial court abused its discretion in denying his motion to introduce evidence of Timothy's prior bad acts under OCGA §§ 24-4-404 and 24-4-405. Because the trial court ultimately excluded the evidence under OCGA § 24-4-403, and the trial court did not abuse its discretion in that regard, this enumeration fails.

On July 9, 2024, Benson filed a notice of intent to introduce evidence of prior bad acts based on the testimony of Mark Frazier, who was Timothy's former step-father. Specifically, Benson sought to introduce evidence of Timothy having allegedly committed a burglary, aggravated assault, battery, and terroristic threats against Frazier in March of 2020. The State objected to the introduction of Frazier's testimony, and a hearing was held the same day.

Benson had previously testified at the immunity hearing that Leanna "explained to [him] that [Timothy] wasn't allowed

---

did not argue that defense at the hearing and did not seek a ruling on that defense, we conclude that the trial court impliedly denied that defense given its other rulings. Cf. *Perkins v. State*, 313 Ga. 885, 895 (2022) (concluding trial court implicitly denied motion for mistrial where trial court adjourned for the day and took the matter under advisement before ultimately giving a curative instruction).

over at [Frazier's] house, because he went over there and threatened the old man, and the cops were called." Benson confirmed that he knew nothing else about what had transpired between Timothy and Frazier. The State argued that the proffered evidence was inadmissible because the evidence from the immunity hearing demonstrated that Benson's knowledge of the alleged other act was limited. The State further argued that at the time of the shooting Benson did not know what allegedly happened between Timothy and Frazier, and, therefore, the proffered evidence was nothing more than inadmissible propensity evidence.

Defense counsel proffered that, in March 2020, Timothy's mom asked Timothy to come to her and Frazier's house during a verbal disagreement. Timothy "came over, forced himself in the house. There was some sort of physical altercation. And he ultimately left and then, at a later time that same evening, sent a threatening text." Counsel then detailed specifics about the incident that she anticipated admitting through Frazier, including that Timothy "[wa]s coming after him, and there's a physical tussle that occur[red]," which was only broken up when Timothy's mother "jump[ed] in between the two and she f[ell] to the ground. And … Frazier [became] concerned for her, and that kind of jar[red] everything back into perspective. And Timothy [left] the home," after which Timothy texted Frazier, which Frazier "interpreted to be threatening."

The State responded that Benson would be well within his right to testify as to his knowledge, if any, of the incident involving Frazier and Timothy "because that is relevant to [Benson] and his state of mind." However, the State asserted that it would be impermissible to permit Frazier to testify as to the specifics of the incident because the record before the court reflected that Benson "doesn't know anything about any of that." The State also argued,

17

"[T]o put [Frazier] up and go, this is what happened, with sort of a mini-presentation of I'm married to the victim's mom, this is the nature of our relationship, this is what happened at this date and time, Mr. Benson doesn't know anything about any of that. [Benson] wasn't present, he wasn't there. He wasn't in the house when Mom fell over. He doesn't know how the incident resolved itself or anything along those lines."

The next morning, the trial court indicated that it read the entirety of the immunity hearing transcripts to verify what Benson had testified to, that Benson had "very limited" knowledge of the incident, that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, and that it would "confus[e] the issues with the jury." The trial court orally denied the motion, denied Benson's request for a certificate of immediate review, and denied Benson's request for a special instruction to the jury regarding his inability to corroborate the incident.

At trial, the trial court permitted Benson to introduce evidence concerning what Benson actually knew about Timothy's prior encounter with Frazier, which he attempted through the cross-examination of Leanna, the sole source of his purported knowledge. Thus, the trial court did not exclude all evidence of the prior incident; rather, it limited the evidence to that which Benson was actually aware of at the time of the shooting. See *Ward*, 318 Ga. at 902 (defendant must establish that he had "personal knowledge" of the "specific acts of violence" at the time the shooting occurred (punctuation omitted)).

On appeal, Benson argues that the trial court abused its discretion in refusing to admit evidence from Frazier about his altercation with Timothy based on our holding in *Copeland v. State*, 316 Ga 452, 458 (2023). We review a trial court's evidentiary rulings for an abuse of discretion. See *Smith v. State*, 322

Ga. 881, 883 (2025).

Here, even assuming that Frazier's testimony was admissible under OCGA §§ 24-4-404 and 24-4-405 despite Benson's limited knowledge of the incident,[13] the record shows that the trial court ultimately excluded this testimony under OCGA § 24-4-403 ("Rule 403"). Rule 403 provides that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." In excluding the testimony, the trial court noted that Benson had "very limited" knowledge of the alleged prior altercation between the victim and a third party and determined that allowing the presentation of a mini-trial through Frazier's testimony "would be significantly prejudicial and confus[e] the issues with the jury." The trial court concluded that, although the proffered evidence had "some probative value[,] … it [was] substantially outweighed by the prejudice of bringing in the other evidence surrounding it."

On appeal, Benson does not argue that the trial court abused its discretion in excluding this evidence under Rule 403, and we see no abuse of discretion in the trial court's determination that allowing Frazier (the victim's mother's ex-husband) to

---

[13] As noted above, Benson had testified at the immunity hearing that his only knowledge of the incident was that Timothy "went over there and threatened the old man." And defense counsel's proffer explained that Timothy came to the house at his mother's request when she and Frazier (who later divorced) got into an argument. See *Beck v. State*, 310 Ga. 491, 498 (2020) (explaining that to be admissible under OCGA §§ 24-4-404(a)(2) and 24-4-405(b), the victim's prior conviction must have been known to appellant and must constitute a "specific act[] of violence" within the meaning of federal case law). Because Benson did not testify at trial, there was limited evidence presented at trial as to his knowledge of the altercation between Frazier and Timothy.

19

testify as to an alleged prior altercation, of which Benson had very limited second-hand knowledge, would have been minimally probative of Benson's state of mind while requiring a mini-trial that would lead to confusion of the issues with the jury. See *Gialenios v. State*, 310 Ga. 869, 879 (2021) (affirming trial court's exclusion of evidence under OCGA § 24-4-404(a)(2) and noting that "even relevant evidence may be excluded if the trial court finds that its probative value is substantially outweighed by the danger of unfair prejudice" (punctuation omitted)), overruled in part on other grounds by *Outlaw v. State*, 311 Ga. 396, 401 (2021). See also *Payne v. State,* 318 Ga. 249, 254–56 (2024) (trial court did not abuse its discretion in excluding evidence of co-defendant's drug use where it concluded probative value of evidence was substantially outweighed by danger of unfair prejudice); *Corley v. State*, 308 Ga. 321, 326 (2020) (no abuse of discretion in excluding evidence of defendant's conversation with neighbor prior to shooting asking for him to call 911 if he heard screaming where it would have been needlessly cumulative and had little probative value); *State v. Stephens*, 310 Ga. 56, 60 (2020) (explaining no abuse of discretion when trial court determines connection between evidence and purpose for which it is being offered is too tenuous to establish relevance or that chain of inferences jury would be required to make was too attenuated).

To the extent that Benson argues that the exclusion of this evidence violated his right to present a defense under the Sixth Amendment to the United States Constitution, this argument also fails. We first note that "it is axiomatic that a defendant's right to present a full defense does not entitle him to place before the jury irrelevant or otherwise inadmissible evidence." *United States v. Rushin*, 844 F3d 933, 941 (11th Cir. 2016) (punctuation omitted). See also *Palmer v. State,* 318 Ga. 511, 527 (2024) (noting

"state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials" (punctuation omitted)). Here, the trial court properly excluded Frazier's testimony after conducting a Rule 403 balancing test. See *Holmes v. South Carolina*, 547 US 319, 326 (2006) (explaining that defense evidence can be excluded "if its probative value is outweighed by certain other factors, such as unfair prejudice, confusion of the issues, or potential to mislead the jury").

4. Benson contends that his trial counsel rendered ineffective assistance by failing to request jury instructions on justification and the use of force for personal property.[14] We disagree.

In order to prevail on this claim, Benson must show both that his trial counsel performed deficiently and that he was prejudiced by counsel's deficient performance. See *Strickland v. Washington*, 466 US 668, 687 (1984). To show deficient performance, he "must overcome the strong presumption that his counsel's conduct falls within the broad range of reasonable professional conduct and show that his counsel performed in an objectively unreasonable way in the light of all the circumstances and prevailing norms." *Thurman v. State*, 311 Ga. 277, 278 (2021) (cleaned up). To establish prejudice, Benson "must show that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different." *Zayas v. State*, 319 Ga. 402, 409 (2024) (cleaned up). We need not address both parts of the *Strickland* test if Benson does not meet his burden of establishing one. See *Blalock v. State*, 320 Ga. 694, 697 (2025).

Prior to trial, Benson's former counsel submitted a request

---

[14] On appeal, Benson does not specify what personal property should have been the subject of a defense of personal property charge, but presumably Benson is referring to the furniture, clothing, and other items that Leanna was moving from the house.

to charge on the use of force in defense of personal property. However, during the charge conference, subsequent trial counsel did not address that instruction. Instead, the discussions revolved around justification in defense of self, others, and habitation and matters tangential to those defenses, upon which the trial court ultimately instructed the jury.

At the motion for new trial hearing, trial counsel, who had been practicing law since 1999 and focused almost exclusively on criminal law, testified that her defense theory was focused on "defense of my client, his family, and his home." She could not recall a strategic reason for leaving out defense of personal property, but she later agreed on cross-examination that a defense of personal property charge could have been confusing for the jury where the items were already outside of the house. Trial counsel also testified that when arguing justification to a jury, "her [goal] is always to boil it down as basic as possible for jurors" because "if you make … arguments that are just so far out, then the jury stops listening to you and will not consider … credible issues or arguments." The trial court credited trial counsel's testimony and ultimately concluded that Benson did not demonstrate prejudice because the charge in question was not adjusted to the evidence.

We conclude that Benson has not shown that counsel acted deficiently in failing to request a charge on defense of personal property. Although trial counsel could not recall a specific strategic reason to forgo this request, "we are not limited in our assessment of the objective reasonableness of lawyer performance to the subjective reasons offered by trial counsel." *Lane v. State*, 312 Ga. 619, 623 (2021). Under the circumstances of this case, it was a reasonable trial strategy to focus on the three strongest justification defenses – defense of self, others, and habitation – that would

have resonated more with the jury, rather than arguing that Benson was justified in shooting Timothy to protect his furniture, clothing, and other personal items. See *Graham v. State*, 323 Ga. 496, 499 (2026) (concluding trial counsel was not deficient in forgoing a charge on defense of property because "[a] competent attorney could have reasonably concluded that the better strategy was to focus on a single, and straightforward, justification defense"). Accordingly, this enumeration of error fails.

*Judgment affirmed. All the Justices concur, except Warren, P. J., not participating.*